**STEWART–WARNER CORP. v. REMCO,**
Inc. (two cases).

Nos. 10689, 10690.

United States Court of Appeals
Seventh Circuit.

July 3, 1953.

Rehearing Denied Aug. 3, 1953.

584

Douglas C. Moir, George B. Christensen and Edward J. Wendrow, Charles J. Calderini, Chicago, Ill., Winston, Strawn, Black & Towner, Chicago, Ill., of counsel, for Stewart-Warner Corp.

Edward B. Casey, William C. Wines and Eugene Resnick, Chicago, Ill., for Remco.

Before DUFFY and LINDLEY, Circuit Judges, and BRIGGLE, District Judge.

DUFFY, Circuit Judge.

In Appeal No. 10689, Stewart-Warner Corporation is designated counter-defendant-appellant, and in Appeal No. 10690 as counter-defendant-appellee. In these appeals Remco, Inc. is designated counter-plaintiff-appellee and counter-plaintiff-appellant, respectively. In this opinion these companies will be called Stewart-Warner and Remco.

Invoking diversity jurisdiction, Stewart-Warner brought this action to recover $83,-118.41 upon open account for merchandise sold and delivered. Remco admitted liability and the court instructed the jury to bring in a verdict accordingly. By special interrogatory the jury found Remco had not unreasonably and vexatiously refused payment of the account, which finding was approved by the court; hence interest was not allowed, and the judgment as entered allowed this claim of Stewart-Warner against Remco in the sum of $83,118.41, from which there has been no appeal.

The trial involved a determination on Remco's counterclaims,[1] labeled Counts I, II, III and IV inclusive. The court directed the jury to find in favor of Stewart-Warner on Counts I, III and IV, and the judgment dismissed said counts of the counterclaim, reversal of which is sought by Remco in Appeal No. 10690. The jury returned a verdict favorable to Remco on Count II, assessing damages at $173,000. Judgment was entered for that sum, but later a remittitur of $15,000 was made. From this judgment for Remco for $158,-000 Stewart-Warner appeals in No. 10689.

Count I of the counterclaim alleges a claim for fraud and deceit. Remco alleges that Stewart-Warner at various times between October 1, 1948, and September 30, 1949, falsely represented to Remco, who was exclusive distributor of Stewart-Warner radio and television products in the Chicago area, that it would supply Remco

1. On the same day that this action was commenced Remco instituted a State court action against Stewart-Warner which was later dismissed. Remco's claims in the State court action were repleaded as Counts I and II of its counterclaim in this action. Counts III and IV of the counterclaim were asserted by amendment on May 27, 1952, while this action was being tried in the district court.

certain quantities of merchantable television sets competitively priced but there was no possibility that Stewart-Warner would have such sets available; that Remco, believing and relying on such representations, expanded and enlarged its sales organization at a great increase in its overhead expenses and that Stewart-Warner, in addition, caused Remco to refrain from rescinding its current distributor contract with Stewart-Warner and to forego entering into agreements with competitors of Stewart-Warner, to its damage in the sum of $200,000. Stewart-Warner's answer put in issue all material allegations of this count, including the one which asserted that Remco was an exclusive distributor of Stewart-Warner, and that the distributor contract between them was an exclusive contract.

Count II alleges that from October 1, 1948, to September 30, 1949, Remco was the exclusive distributor of Stewart-Warner's radio and television products in the Chicago metropolitan area in accordance with the distributor contract between them; that under such contract Remco was exclusive distributor in the Chicago area, "except under special circumstances," or with reference to sets carrying a "special identifying trade or brand name"; that Stewart-Warner failed to carry out the distributor contract, in that it supplied radio sets to other distributors at a price averaging 50% of the price of identical sets sold to Remco, and that a portion of such sets were sold by other distributors to Remco's dealers at a price below that which Remco could sell; and that such sales to the other distributors by Stewart-Warner were not made "under special circumstances" as that term is defined in the trade, and that such sets did not carry a "special identifying trade or brand name." On this count Remco asked for $200,000 damages. Answering this count, Stewart-Warner put in issue all of its material allegations, including that Remco was an exclusive distributor and that the distributor contract was an exclusive contract; that Stewart-Warner violated any of the terms of the contract; and as a separate defense alleged that Remco had failed to give Stewart-Warner notice of claim within the time required by the distributor contract.

Remco charged in Count III of its counterclaim that Stewart-Warner promised Remco it would be given first opportunity to dispose of the radio inventory held by Stewart-Warner upon prices being reduced; that Remco agreed to dispose of such inventory upon same being offered to it; and that Stewart-Warner failed to offer the radio inventory to Remco but instead offered it to another corporation. Under this count $200,000 damages was also asked. Stewart-Warner's answer put in issue all of its material allegations, and also pleaded the affirmative defense that the alleged oral promise to sell the radio inventory is unenforceable under the Illinois Statute of Frauds, Sec. 4, Ch. 121½, Ill.Rev.Stats.

Material allegations of Count IV assert Stewart-Warner's breach of an agreement to make available to Remco during October, November, and December, 1948, a total of 1,700 merchantable and competitively priced television sets, and during 1949 to make available to Remco additional television sets at the rate of 500 per month, same also to be merchantable and competitively priced, to Remco's damage of $200,000. Stewart-Warner's answer to this count put in issue all of its material allegations and also, by way of affirmative defense, claimed that the alleged agreement respecting delivery of competitively priced, merchantable television sets is unenforceable under the Illinois Statute of Frauds, supra.

Stewart-Warner is a manufacturer of radio and television sets and parts. Remco at the times in question was a distributor of some 20 lines of household and other appliances, including records, outboard motors, power bikes, radios, television sets, refrigerators, deep freezers, etc. Remco's place of business was located in a five-story and basement building at Ohio and LaSalle Streets in Chicago.

Remco first became a Stewart-Warner distributor of radio products under a written contract, for a period from July 12, 1948, to September 30, 1948, with a territory consisting of 20 counties in northern Illinois and Indiana, including the city of

Chicago. This agreement was replaced by another of identical provisions for the period from October 1, 1948, to September 30, 1949. Among others, the contracts contained the following provisions, Remco being referred to therein as "the Distributor":

"1b. Stewart-Warner will sell and the Distributor will buy radio products at Stewart-Warner's prevailing list prices and discounts or at Stewart-Warner's net prices to Distributors in effect at the time of shipment, in accordance with the terms of sale established from time to time by Stewart-Warner.

"1c. The Distributor will resell the goods thus purchased from Stewart-Warner only in the territory described and set forth in Exhibit A attached hereto.

"1d. It is not the intention of Stewart-Warner to sell Stewart-Warner Radio Products as defined above to others in said territory, but it is recognized that special circumstances may make such a sale or sales desirable, and Stewart-Warner is not precluded from so doing. Stewart-Warner reserves the right to make sales of its Radio Products to its officers and employees on such terms as it deems desirable.

\* \* \* \* \* \*

"9b. This agreement shall constitute the entire agreement between the parties and no promises, understandings or representations of any kind shall be binding upon either party unless endorsed hereon.

"9c. It is recognized that during the term of this agreement there is likely to be correspondence passing back and forth between the parties and conversations between the Distributor and one or more representatives in one or more capacities of Stewart-Warner. No correspondence passing between the parties and no conversation between the Distributor and any representative of Stewart-Warner shall have the effect of modifying or supplementing this agreement in any respect whatsoever, and this agreement may not be modified or supplemented except by a written agreement signed by the Distributor and an executive officer of Stewart-Warner and attested to by its Secretary or Assistant Secretary.

"9d. If the Distributor shall have reason to believe it has any claim against Stewart-Warner in respect of transactions growing out of this agreement, the Distributor promptly will present to Stewart-Warner, in writing, any such claim with full details as to the basis and amount thereof. If the Distributor fails to make any claim within sixty days after the Distributor knows, or has reason to know, of the basis for any such claim, then the Distributor will not make any claim against Stewart-Warner which it has not reported thus promptly to Stewart-Warner.

"9e. This agreement shall not be valid or become effective until and unless accepted at Chicago, Illinois, by Stewart-Warner by its proper officer or officers, and the agreement, when so accepted, shall be taken and considered as a contract to be performed under, subject to and interpreted under the laws of the State of Illinois."

During 1948–1949 there was a heavy demand for television sets but a declining market for radios. Stewart-Warner overproduced on radios and at the end of 1948 had an inventory on hand of over 14,000 radio sets which it was unable to sell through its usual distribution channels. McGreevy, president of Remco was acquainted with the situation.

Stewart-Warner negotiated with several parties in an endeavor to dispose of the excess inventory. Then a partnership, called the Arcade Company, was formed by three residents of Chicago, for the purpose of purchasing and selling the excess radios. On April 19, 1949, Stewart-Warner entered into a contract with Arcade to sell 14,279 radio sets to it for $200,000, which was approximately the cost-price to Stewart-Warner. It was agreed that re-sales by Arcade would only be made in territories not covered by then existing Stewart-Warner dis-

tributor contracts. This provision was later modified to permit Arcade to sell to retail dealers in California where the Stewart-Warner distributor was inactive, and also to make sales in the southeastern part of the United States.

On this appeal both Stewart-Warner and Remco largely directed their arguments to the issues raised by Count II of the counterclaim. However, Remco claims that the trial court erred in directing verdicts on Counts I, III and IV and states that if the cause be remanded, it is entitled to a new trial on those three counts. But, says Remco, if the judgment in its favor is sustained as to Count II, it will waive its appeal on the claims asserted in Counts I, III and IV of the counterclaim.

 We think the district court correctly directed a verdict for Stewart-Warner on Counts I, III and IV. Count I charged fraud and deceit, based upon an alleged oral promise to deliver television sets in certain quantities. Remco knew that Stewart-Warner purchased the chassis for its television sets from a supplier who at the period for which it asked damages in Count I had long been tied up by a strike.[2] We think the strike clause in the contract between Stewart-Warner and Remco is broad enought to excuse the non-delivery of television sets, if any such agreement had been made as alleged by Remco.[3] Still another bar to Remco's claim is that under Illinois law, "fraud in the inducement must be based upon a misrepresentation of fact and cannot rest on a false promise to do an act in the future, even though accompanied by an intention not to perform". Stahly, Inc. v. M. H. Jacobs Co., 7 Cir., 183 F.2d 914, 916, certiorari denied, 340 U.S. 896, 71 S.Ct. 239, 95 L.Ed. 650; Brodsky v. Frank, 342 Ill. 110, 173 N. E. 775.

We also agree with the trial court that Remco's proof failed to establish a claim under which relief could be granted under Counts III and IV of the counterclaim.

In considering the issues under Count II, of utmost importance is the following provision of the distributor contract between Stewart-Warner and Remco: "It is not the intention of Stewart-Warner to sell Stewart-Warner Radio Products as defined above to others in said territory, but it is recognized that special circumstances may make such a sale or sales desirable, and Stewart-Warner is not precluded from so doing."

 There was much dispute and argument at the trial as to whether Remco was an exclusive distributor for Stewart-Warner. The contract does not use the word "exclusive." The argument revolved around the various definitions or connotations of that word. While the contract specifically provided that Stewart-Warner could make sales to others in the Chicago area under "special circumstances," it is clear that Remco was Stewart-Warner's exclusive distributor in the Chicago area in the sense that Remco was the only one, while the contract was in force, with the right to purchase Stewart-Warner radio products at regular distributor's prices for the purpose of resale to dealers.

As heretofore stated, Remco's claim under Count II is based upon the sale by Stewart-Warner to Arcade of 14,279 surplus radio sets at a total price of $200,000, which was admittedly less than the gross total for such sets at list prices previously used by Stewart-Warner in selling similar sets to its distributors. Remco argues that any sale of radio sets by Stewart-Warner to Arcade during the period mentioned was a violation of Remco's franchise agreement. As to the provision of the contract requir-

2. In May, 1948, Stewart-Warner contracted with Belmont Radio Corp. to build the chassis for 5,000 television sets for delivery from August through December, 1948. Belmont could not make delivery due to a strike at its plant lasting from July, 1948, to April, 1949. As a result Stewart-Warner had to change its plans. It manufactured a few sets, using its own employees. Stewart-Warner advised its distributors, including Remco, of the situation by a bulletin dated November 2, 1948.

3. Stewart-Warner is excused from making deliveries with reasonable promptness in the event the delay is "caused by fire, flood, strike, failure of source of supply, or any factor beyond Stewart-Warner's control."

ing notice of a claim within 60 days, Remco claims that its president and other officers did not have "full" information on the Arcade deal until September, 1949, which was within 60 days of the date when Remco started its action against Stewart-Warner in the State court.

Arcade sold 3,013 (net) radio sets in the Chicago area. All were sold to premium houses[4] or other non-dealers to whom Stewart-Warner could have sold direct, except that 527 sets were sold to Hudson Ross, a dealer,[5] and 19 sets to Tri-Par Radio, whose status as a premium house may be questionable.

Both Stewart-Warner and Remco have devoted many pages in their briefs to the question of damages. The jury's verdict was apparently made up of two items: $115,000, designated by Remco as "out-of-pocket loss" (but which is based upon Count I of the counterclaim), and $58,000, which McGreevy testified would have been Remco's profit had it been able to purchase the 14,279 sets at $200,000 and if it had sold them at certain prices indicated by him. It seems to us that the jury was confused on the question of damages. Testimony being received on four separate counterclaims, the apparent confusion is understandable. However, in view of our disposition of the case, we do not need to discuss further the question of damages.

The sale of the radio sets to Arcade was a closing out sale of obsolete merchandise at cost, prior to Stewart-Warner bringing out new models. The sale was not in the usual course of business and was to a firm which was neither an actual nor a potential customer of Remco. Arcade's re-sales were channeled so as not to take business away from regular distributors. The transaction was designed so as not to compete or interfere with sales which regular distributors would make to their dealers. The situation was similar to sales to premium houses, because such sales would not compete with sales made by distributors to their dealers.

Under its franchise Remco had only the qualified right to purchase at "prevailing list prices and discounts or at Stewart-Warner's net prices to distributors in effect at the time of shipment." Remco had no obligation to purchase any certain or minimum quantity of radio products. It was natural that in its contract Stewart-Warner would seek to protect itself as to all possible or foreseeable eventualities. Hence, in addition to reserving the right for sales in areas where it had no distributors or where such distributors were inactive, as well as providing for sales to its employees, and understanding its right under a custom of the trade to sell to premium houses in the Chicago area, Stewart-Warner reserved to itself the right to make sales in that area when "special circumstances * * * make such a sale or sales desirable." We hold that the sale to Arcade constituted a sale under "special circumstances," as the term was used in the Remco distributor contract.

In Appeal No. 10690 the judgment dismissing Counts I, III and IV of the counterclaim is affirmed. In Appeal No. 10689 the judgment in favor of Remco, based on Count II of the counterclaim, is reversed with directions that said count be dismissed.

---

4. Premium houses sell a variety of goods, including radios, to fraternal societies and other organizations, who use them for prizes, premiums and gifts. Premium houses do not deal with the public generally, as do retail dealers. A custom of the trade was established that sales could be made to premium houses in spite of the existence of an exclusive distributor's contract.

5. Stewart-Warner claims Remco, by its vice president, Howard consented to the sale. Taylor, sales manager of Stewart-Warner, spoke to Howard at a time when President McGreevy was out of the city. Hirsch of Hudson-Ross had threatened to acquire some of the Stewart-Warner sets elsewhere and advertise them in the Chicago area in a manner to upset Remco's entire market. Taylor recommended that Howard agree that Arcade could sell some sets to Hudson-Ross. At the trial Hirsch testified that Arcade refused to sell to him without Stewart-Warner's permission. Howard died before the trial. The sale involved a model which Remco had never purchased in any quantity.