THE METROPOLITAN SANITARY DISTRICT OF GREATER CHICAGO, Plaintiff-Appellant, *v.* ANTHONY PONTARELLI & SONS, INC. *et al.*, Defendants-Appellees.

(No. 55265;

First District—September 8, 1972.

830

Allen S. Lavin and Sidney B. Baker, both of Chicago, (Fred Herzog and Ralph Brill, of counsel,) for appellant.

Economos, Alexander & Regas, of Chicago, (George W. Alexander and Albert J. Horrell, of counsel,) for appellees.

PER CURIAM:

Plaintiff, in this appeal from an order granting defendants[1] summary judgment, contends that the motion was erroneously granted.

All counts of the amended complaint related to a contract between plaintiff and Anthony Pontarelli and Sons, Inc. (hereinafter referred to as Pontarelli) for the construction of a sewer. The substance of those counts is as follows: Count I alleged that Pontarelli and Burton Scheidt, plaintiff's Chief Engineer, through fraud and deceit, induced plaintiff to pay Pontarelli $2,965,042.89 to which Pontarelli was not entitled; Count II alleged that when Pontarelli entered into the contract, it falsely and fraudulently represented that it would do all of the work required by the contract, but Pontarelli never intended to abide by the contract terms; Count III alleged a combination and conspiracy on the part of Pontarelli and Scheidt to defraud plaintiff; Count IV alleged that Pontarelli wrongfully obtained $1,114,125.13 in payment for extra work which was not authorized by the Board of Trustees as required by the contract and that Pontarelli refused to repay that amount as required by the contract; Count V alleged a cause of action for breach of express and implied warranties; Count VI alleged a cause of action for breach of contract; Count VII alleged a cause of action for negligence; Count VIII alleged a cause of action for unjust enrichment; and Count IX, as amended, alleged a cause of action against Fidelity and Deposit Company of Maryland (hereinafter referred to as Fidelity) as surety on Pontarelli's performance bond.

No answers to this complaint were filed, but all defendants filed separate motions for summary judgment which were supported by affidavits and other documents. Plaintiff then filed counter-affidavits and documents.

Generally, Pontarelli contended that the complaint was conclusory. Specifically, as to Count I, Pontarelli alleged that the allegations were insufficient to state a cause of action against it; that because plaintiff had knowledge imputed to it through Scheidt of the actual facts, there

---

[1] Defendants herein are: Anthony Pontarelli & Sons, Inc., the party obligated by a contract with plaintiff to build the sewer which is the basis of this litigation; Burton Scheidt, formerly plaintiff's Chief Engineer; and Fidelity and Deposit Company of Maryland, the surety on Pontarelli's bond.

could have been no reliance upon the representations of Pontarelli or Scheidt, and that plaintiff was estopped by its inspection of the construction to deny proper performance of the contract. As to Count II Pontarelli contended, *inter alia*, that because the charges did not relate to existing or past facts, no cause of action was alleged. As to Count III Pontarelli contended that the complaint did not allege an essential element of a cause of action for conspiracy *i.e.*, damages, and again raised the defense of imputed knowledge. With reference to Count IV Pontarelli contended that the authorization of the final payment for extras ratified all extra payments and plaintiff was thereby estopped from denying performance; that Scheidt's approval of the work was a complete defense under the contract, and the requirement of Board approval of extra work was obviated by the contract. With reference to Counts V, VI and VII, Pontarelli again raised the defense of imputed knowledge and estoppel and contended further that Scheidt's approval of the work was binding upon plaintiff. Also, as to Count VIII Pontarelli raised the defense of imputed knowledge. With respect to Count IV Pontarelli contended that because no cause of action was properly pleaded against it, no cause of action was pleaded against Fidelity.

In Scheidt's motion for summary judgment as to Count I he contended in substance that plaintiff had imputed knowledge and therefore could not have relied upon any false representations; that plaintiff was estopped from claiming damages; and that plaintiff did not plead a good cause of action. As to Count III, Scheidt contended that because of the knowledge imputed to it, plaintiff would not have been damaged as a result of Scheidt's representations, that plaintiff was estopped from claiming damages, and plaintiff had not pleaded a good cause of action. Scheidt contended that both counts were conclusory and that no genuine issue of material fact existed. The motion did not expressly treat the remaining counts of the amended complaint as Scheidt merely stated that they did not seek relief against him.

Fidelity, in its motion for summary judgment on Count IV as amended, expressly relied upon Pontarelli's motion. Fidelity went on to contend that plaintiff's approval of the final payment constituted an acceptance of Pontarelli's performance thereby releasing Fidelity of its obligation and liability.

The gist of the affidavits filed by plaintiff is set out below.

The sewer was not constructed in accordance with the terms of the contract. The sewer was improper, faulty and unworkmanlike in the following respects: it is out of alignment; it has a rough grade (in some places the grade varied 20 to 30 inches within a very short distance) and sharp breaks, its concrete bed is unstable, and, in part, the sewer

settled more than eight feet. One affidavit stated that, instead of concrete as called for in the contract, a twelve inch stone bed was laid under the sewer. The contract required 330,000 pounds of reinforcement steel; only 113,097 pounds were delivered to the jobsite, but plaintiff was billed for 412,758 pounds, the difference in value amounting to $33,000. Plaintiff was also billed for 8146 cubic yards of encasement concrete but only 7465 cubic yards were installed, a difference in value of $10,400. The location and distribution of reinforcement steel and concrete covering for the sewer pipe was not as required by the contract. An insufficient quality of material was used in the sewer's construction, the concrete top to the sewer was improperly placed. Extremely poor construction procedures resulted in a deficiency of the encasement concrete in the invert and the arch. The joints in the sewer opened causing it to leak, allowing foreign matter to infiltrate the sewer and be carried to a treatment plant. The leaks also caused stalactites to form on the inside top of the pipes. The flowage capacity of the sewer was reduced below contract requirements. This was partially caused by the use of steel bands on the joints. The "sandbox" procedure used in the construction proved to be unsatisfactory. Better "dewatering" of the site was possible at the time of repairs and possibly during the construction itself. Approximately ten percent of the sewer line needed replacement or repair. Where repairs have been made, a good grade has been maintained and there are no apparent leaks. A portion of the sewer will be abandoned. In both May and June of 1966 the sewer collapsed. The Pittsburgh Testing Laboratory was retained to review the work on the sewer and reported that there was a shortage of concrete around the pipe and the amount of reinforcement steel "probably" was less than that called for in the design drawings. It was through the report of the Pittsburgh Testing Laboratory, filed on September 30, 1966, that plaintiff first learned of the deficiency in the materials. It was Scheidt's duty to inspect the work and the materials used. Scheidt appointed Edward Lopatowski as resident engineer and he was to report all matters to Scheidt. Although there were gross irregularities in the work, Lopatowski and Scheidt certified that the work was properly performed in compliance with the plans and specifications. Lopatowski knew that the sewer alignment was poor, the grade was not being maintained and the joints were open. When he objected to the construction methods employed and attempted to control Pontarelli, his efforts met with no success. In fact, on one occasion, after Lopatowski repeatedly attempted to have Pontarelli stop the work, one of the Pontarellis said, "If he does not shape up, we will have him shipped to Alaska." Later a Pontarelli said, "We will have him sent so far from here, it will take

him four hours to get to and from work." Lopatowski and other employees of plaintiff had frequent lunches with the Pontarellis. Lopatowski would select those of plaintiff's employees who were to go to lunch with Pontarelli on a given day. After lunch, which Pontarelli paid for, the subordinate employees would leave but Lopatowski would remain with Pontarelli.

Various changes, not included in the original contract, were put into effect and there is nothing in the record to show that any official correspondence authorized those changes. The changes included variations in the elevation, the type of encasement concrete and the number of reinforcement bars.

In a discovery deposition, Vinton Bacon, plaintiff's General Superintendent since 1962, testified, *inter alia,* that the design for the sewer in question was excellent and the soil borings accurately showed the water and sand conditions. There were no changed conditions. The sewer leaked not because of poor soil conditions, but because of faulty construction techniques such as Pontarelli's failure to dewater and failure to build a proper foundation. If the sewer had been built in accordance with the original plan, it would have functioned properly. Except for specific contract provisions, the method of construction is generally determined by the contractor. Once a contract is signed the Chief Engineer is plaintiff's sole agent.[2] Various engineers at the jobsite would report shortages of materials to the Resident Engineer who in turn would report to his immediate superior, a subordinate of the Chief Engineer. The sewer is still functioning, but it carries infiltration to a treatment plant, thus causing damage to that plant. Some amount of infiltration is always found in sewers and no infiltration tests were taken on the sewers that drain into the sewer which is the subject of controversy. There were no working plans for a new sewer. Reports of the faulty performance were made by various engineers and inspectors. It was common knowledge that the job was not being done correctly. Engineers would con-

---

[2] The extent of the Chief Engineer's authority over this project is demonstrated by the contract provisions which include:

"The Chief Engineer, or other Engineer designated by him, shall have full power to reject or condemn all materials furnished or work performed under this contract, which in his opinion do not conform to the terms and conditions herein expressed. ✻ ✻ ✻

The Engineer shall in all cases decide every question of an engineering character which may arise relative to the execution of the work under this contract on the part of the Contractor, and his decision shall be final and conclusive on both parties hereto; and such decision, in case any question may arise, shall be a condition precedent to the right of the Contratctor to receive any money or compensation for anything done or furnished under this contract."

tinuously inspect the jobsite; they would certify performance before payment was made. Scheidt knew that improper amounts of steel and concrete were being placed in the sewer. The estimate vouchers did not correspond with the materials that actually went into construction. The estimate vouchers for steel were prepared at the jobsite in the presence of the Resident Engineer, the Engineer of Estimates and Inspection and Pontarelli's representative. No documents could be found which indicated that Pontarelli invoiced or demanded payment for the concrete and steel. Requests for payment for "extras" go through various internal procedures, and, if the request is for more than $2,500 it must be submitted to the Board of Trustees. The contractor has no power to submit the request to the Board.

In an evidence deposition, Burton Scheidt testified, *inter alia,* that the test soil borings taken at the construction site prior to the commencement of the construction revealed no objectionable soil conditions, but it is impossible to anticipate quicksand conditions. Shortly after construction began, he was informed that very unstable ground conditions were encountered. Scheidt and other engineers determined that Pontarelli was having greater difficulty than anticipated. Substantial changes were necessary and the cost would be increased. Scheidt was anxious to have the work completed because certain communities were in need of the facilities. The Sewer Division recommended that a higher grade of structural concrete be used and that proposed change with other proposals was submitted to the Board of Trustees. Because it was practically impossible to place the steel into the sewer, the amount of steel used was decreased on Scheidt's orders. He felt the better grade of concrete was important and the presence of reinforcement steel was not critical. He felt the reduction in cost as a result of the partial elimination of reinforcement steel would be offset by increases in other costs and consulted the Engineer of Investments in this regard. Scheidt believed that if costs could not be equalized, corrective figures would have to be drawn up. On re-direct examination he indicated that the records do not reflect this equalization of costs. He knew that all of the steel paid for was not installed in the sewer and found nothing wrong with the payment for the steel in spite of the fact that some steel was not installed. Pontarelli was doing a good job and Scheidt did not object. The job was finished in 1960, but depressions occurred along the sewer line. The sewer failed; its joints opened. These faults, however, were the result of subsoil conditions and not because the contractor improperly performed the work. A firm determination of why the sewer failed was never made, but subsoil conditions were at the heart of the problem. Scheidt ordered Pontarelli to make immediate repairs to the faults and

to voucher the Board of Trustees. On cross-examination Scheidt testified that the order to delete the reinforcement steel was oral and was made after consultation with other engineers. Although Scheidt did not know that one supplier provided less than all of the concrete vouchered for, he said it was usual that other suppliers would be contacted if necessary to keep the job in progress. Any questionable items billed by Pontarelli were discussed by various people within plaintiff's organization. Although $1,113,813.35 in extras may have been paid without the approval of the Board of Trustees, the vouchers for that amount were processed and approved by: Cost and Estimate Department, Sewer Division, Assistant Chief Engineer in Charge of Construction, Law Department and Scheidt himself. He believed everything was "in conformity." On re-direct examination Scheidt testified that plaintiff changed soil testing companies after this job.

Letters were included with various documents filed in this cause. These letters, from the Chairman of the Committee on Engineering to the Board of Trustees, recommended passage of the following orders: that changed conditions materially differing from those contemplated were encountered and that the contract provide for payment for the additional costs resulting from those changed conditions; that Pontarelli be authorized to install steel bands with gaskets at a total approximate cost of $240,000; that the elevation of the sewer be raised and a credit of $25,000 inure to plaintiff; that the actions of the Chief Engineer in authorizing rehabilitative work be ratified and Extra Voucher No. 1 in the amount of $30,000 as partial payment be authorized; that Voucher No. 18—Extra in the amount of $113,675.84 be authorized as final payment for extra work; that Voucher No. 16—Final in the amount of $44,408.70 be authorized. All of the recommended orders were passed by the Board. The letters also had the effect of informing the Board that "extra" work was being performed by Pontarelli.

Also included in the record on appeal are 16 estimate vouchers approved by the Chief Engineer and various other members of plaintiff's staff.

■■ The basic principle to be applied in actions wherein a motion for summary judgment has been made was restated in *Fooden v. Board of Governors of State Colleges and Universities* (1971), 48 Ill.2d 580, 586, 272 N.E.2d 497, 500. There the court stated:

> "[U]pon motion for summary judgment the judgment shall be rendered forthwith if the pleadings, depositions and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

As recently stated in *Doherty v. National Casting Division, Midland-Ross Corp.* (1972), 6 Ill.App.3d 329, "The right of a jury trial shall not be denied if fair-minded persons can draw different conclusions from the facts set forth in these documents." The Civil Practice Act expressly provides [3] that defendant may move for summary judgment at any time. Thus, the act implies that the motion may be made, as in this case, prior to the filing of an answer. The effect of such procedure upon the general rule to be applied to summary judgment cases was discussed in *Moore v. Pinkert* (1960), 28 Ill.App.2d 320, 324-325, 171 N.E.2d 73, 74-75, where the court reasoned:

> "The summary judgments were entered on defendants' motion before the defendants had filed any pleadings. The 1955 amendment to the Civil Practice Act (Ill. Rev. Stat. 1955, chap. 110, par. 57) provided that a defendant might make a motion for summary judgment 'at any time.' That amendment was modeled on Federal Rule 56. Federal cases interpreting that rule hold that a defendant may file a motion for summary judgment before he files any pleadings. Gifford v. Travelers Protective Ass'n of America, 153 F.2d 209; Lindsey v. Leavy, 149 F.2d 899. The case before us illustrates the danger of the indiscriminate application of such rule. The purpose of summary judgment procedure is to determine whether there is a genuine issue of fact involved in the case. Allen v. Meyer, 14 Ill.2d 284, 152 N.E.2d 576; Diversey Liquidating Corp. v. Neunkirchen, 370 Ill. 523, 19 N.E.2d 363. Ordinarily the issues are made up by the pleadings. From an inspection of the pleadings the court can determine whether or not a factual issue is raised. On summary judgment proceedings the court considers the pleadings, the affidavits and the entire record to determine whether or not it can be said that a material dispute exists as to the facts. People ex rel. Sharp v. City of Chicago, 13 Ill.2d 157, 148 N.E.2d 481. When there is no answer filed and the defendant petitions for a summary judgment, the court must apply the same rule, and among other things which the court can and should consider is whether or not the complaint, standing alone, states a cause of action. It would seem better to first test the validity of the complaint by a motion to strike. No such motion was made in this case and in the Dvorak judgment order the court holds that the complaint failed to state a cause of action. There was no answer filed to the complaint, inartfully drawn as it was. In this proceeding all uncontradicted allegations made by the

[3] Ill. Rev. Stat. 1967, ch. 110, par. 57(2).

plaintiff must be taken as true (Roberts v. Sauerman Bros., Inc., 300 Ill.App. 213, 20 N.E.2d 849), unless there is a showing made in the affidavits and other documents in the record that the allegation cannot be proved. Loving v. Allstate Ins. Co., 17 Ill.App.2d 230, 149 N.E.2d 641."

In deciding the motion for summary judgment the court considers the pleadings to determine what the issues are and in so doing it presupposes that the pleadings join the issue. (*Mastercraft Lamp Co. v. Mortek* (1960), 28 Ill.App.2d 273, 275, 171 N.E.2d 427, 428.) The court is not however prohibited from considering affirmative defenses raised in the motion for summary judgment in spite of the fact that those matters were not raised in an answer or by a motion under Ill. Rev. Stat. 1967, ch. 110, par. 43(4) or 48. *Slone v. Morton* (1963), 39 Ill.App.2d 495, 497, 188 N.E.2d 493, 494.

■■ The essential elements of a cause of action for fraud were stated in *Roda v. Berko* (1948), 401 Ill. 335, 339-340, 81 N.E.2d 912, 914, where the court stated:

"A misrepresentation, in order to constitute fraud which will warrant a court of equity in rescinding a contract, must contain the following elements; It must be a representation in the form of a statement of a material fact, made for the purpose of inducing the other party to act. It must be false and known by the party making it to be false, or not actually believed by him, on reasonable grounds, to be true. The party to whom it is made must be ignorant of its falsity, must reasonably believe it to be true, must act thereon to his damage, and in so acting must rely upon the truth of the statement. *Bouxsein v. First Nat. Bank*, 292 Ill. 500; etc."

*Accord, Roth v. Roth* (1970), 45 Ill.2d 19, 23, 256 N.E.2d 838, 840.

■■ An analysis of Count I of the amended complaint reveals that there are allegations that Scheidt, acting with Pontarelli, knowingly prepared and approved or caused to be prepared and approved false and fraudulent estimates and vouchers. Scheidt knew plaintiff would rely upon those representations and, in fact, plaintiff believed the estimates and vouchers were true. As a result of the statements contained in the estimates and vouchers plaintiff paid Pontarelli $2,965,042.89. Thus, the elements of an action for fraud were well pleaded.

Defendants contend, however, that notwithstanding the fact that a proper cause of action may have been pleaded in Count I, plaintiff is not entitled to recovery thereunder because, in fact, plaintiff knew of the actual manner in which the construction was being carried out. This knowledge, they argue, was imputed to plaintiff through the knowledge

of its various agents particularly Scheidt who were familiar with the activities at the construction site.

■■■ The rule relating to "imputed knowledge" was set forth in *Booker v. Booker* (1904), 208 Ill. 529, 541-542, 70 N.E. 709, 714, as follows:

> "It is also true, as a general proposition, that notice to the agent of facts learned by him while actually engaged in the business of his principal is notice to the principal. Notice to the agent to be notice to the principal must, as a general rule, be given to the former while acting in the course of his employment."

The *Booker* case goes on to state that the rule is based upon two presumptions. First, that the agent has acquired knowledge which he has a duty to impart to his principal. Second, that the agent performed that duty. The Court pointed out, however, that "whenever it appears that the agent has a motive or interest in concealing the fact from his principal, the latter will not be bound." As further stated in *Cowan v. Curran* (1905), 216 Ill. 598, 617, 75 N.E. 322, 329:

> "The presumption that the agent communicates the knowledge which he has to the principal, does not prevail where it is certainly expected that the agent will not perform this duty, 'as where the agent, though nominally acting as such, is in reality acting in his own or another's interest and adversely to that of his principal.' (Mecham on Agency, sec. 723; Reinhard on Agency, secs. 356, 357; *Frenkel v. Hudson*, 82 Ala. 159."

*Accord, Neagle v. McMullen* (1929), 334 Ill. 168, 181, 165 N.E. 605, 610.

■■■ Because the amended complaint in the instant case alleges fraud against Scheidt, the presumption that he would convey his knowledge of the actual construction of the sewer to plaintiff, his principal, disappears. Thus, the doctrine of imputed knowledge cannot be applied to this case, in its present posture, insofar as that doctrine relates to the knowledge allegedly imputed to plaintiff through Scheidt. Defendants contend, however, that the knowledge of actual performance of the construction project was imputed to plaintiff not only through Scheidt but also through the numerous other engineers plaintiff had at the construction site. Plaintiff counters this argument by contending that the knowledge of the other engineers at the construction site could not be imputed to plaintiff because they were under a duty to report, directly or indirectly, only to Scheidt, who, in turn, was the only one authorized to report to plaintiff's Board of Trustees. The scope of the authority of the various subordinate engineers is, however, not adequately defined. Moreover, there is a conflict as to whether their knowledge was of faulty and fraudulent performance on Pontarelli's part or of a good job by Pontarelli which re-

sulted in faults because of poor subsoil conditions or faulty design, thus raising a genuine issue of material fact. The granting of summary judgment with respect to Count I was therefore improper.

■■■ As to Count III, which alleged a cause of action for conspiracy, Pontarelli contends that no recovery may be had thereunder because plaintiff incurred no damages. In support of this theory Pontarelli contends that the knowledge imputed to plaintiff through Scheidt and the other engineers operated to negate any possibility of damages of plaintiff. Pontarelli is correct in its contention that a civil wrong resulting in damages is the gist of a cause of action for conspiracy. (*Pustelniak v. Vilimas* (1933), 352 Ill. 270, 277, 185 N.E. 611, 614.) However, as a result of the determination reached above upon the question of imputed knowledge, Pontarelli's theory is not valid as applied to this case. Thus, because Pontarelli was not entitled to judgment as a matter of law on Count III, summary judgment thereon was improper. The evidence that $43,400 was charged by and paid to Pontarelli for material which both Pontarelli and Scheidt knew was never delivered also precluded the entry of a summary judgment on Counts I and III.

■■■ In considering Count II of the complaint this court is mindful that one of its functions when presented with a case in this state of pleadings is to determine whether or not the count states a cause of action. (See *Moore v. Pinkert, supra.*) Count II raises the alleged fraud of Pontarelli in that when it entered into the contract, it represented that it would do all of the work required thereunder, while in fact Pontarelli knew those representations were false and never intended to abide by the contract terms. In its brief plaintiff admits that no cause of action exits in Illinois based upon these grounds. Plaintiff goes on to urge that this court change the law in his regard, as other jurisdictions have done. We do not perceive that to be the function of this court, and we therefore decline to do so, following instead the existing law of this State as reiterated in *Illinois Rockford Corp. v. Kulp* (1967), 88 Ill.App.2d 458, 472-473, 232 N.E.2d 190, 198, *rev'd on other grounds*, 41 Ill.2d 215, 242 N.E.2d 228, where the court stated:

"A misrepresentation relating to something to be done in the future does not constitute such fraud in law as will give rise to the recovery of damages in an action for fraudulent misrepresentation. The fraud must be complete at the time of the transaction and consequently cannot be based upon an intention to commit a fraud in the future. May v. Larson Co., 304 Ill. App. 137, 26 N.E.2d 139. A fraudulent misrepresentation which induces a person to action must be based upon a present or a past fact and cannot rest upon

a false promise to do something in the future even though accompanied by an intention not to perform. Stewart-Warner Corp. v. Remco, Inc., 205 F.2d 583."

(Accord, Brodsky v. Frank (1930), 342 Ill. 110, 117, 173 N.E. 775, 778.) Thus, summary judgment was properly entered on Count II.

As to Count IV, plaintiff contends that it pleaded a valid cause of action for unjust enrichment by reason of Pontarelli's receipt of payments for alleged extra work without compliance with valid and necessary conditions precedent. Plaintiff contends that payments for extra work in the amount of $1,114,125.13 were made without authorization of the Board of Trustees. In support of this theory plaintiff relies upon the contract provision for "Extra Work" which provides:

"The Contractor shall perform such extra work as the Engineer may direct in his written order, provided that no extra work, the total price or cost of which is in excess of Twenty-Five Hundred Dollars ($2,500.00), shall be performed by the Contractor until the Engineer is authorized by the Board of Trustees of said Sanitary District to issue a written order therefor, and shall have issued such written order."

The trial court found that the "Extra Work" provision requiring authorization by the Board of Trustees was waived by the actions of plaintiff in paying for the work.

The Supreme Court in Kenny Construction Co. v. Metropolitan Sanitary Dist. of Greater Chicago (1972), 52 Ill.2d 187, was confronted with a case which turned on contractual language identical to that found in the contract in the case at hand. The court considered the "Extra Work" provision and the identical "Changed Conditions" provision which is found in the contract in the instant case. The latter provision states:

"Should the contractor encounter during the progress of the work sub-surface conditions at the site materially differing from any shown on the contract drawings or indicated in the specifications or such conditions as could not reasonably have been anticipated by either The Metropolitan Sanitary District of Greater Chicago or the contractor which conditions will materially affect the cost of the work to be done under the contract, the attention of the Chief Engineer must be immediately called to such conditions before they are disturbed. The Chief Engineer shall thereupon promptly investigate the conditions and if he finds that they do so materially differ, the contract may with his written approval be modified to provide for increase or decrease of cost and/or differences in time resulting from such conditions. Any increase in costs

resulting therefrom should be subject to approval by the Board of Trustees."

The court held that the two provisions stand independently. The "Extra Work" provision relates to work in addition to the undertaking under the contract, while the "Changed Conditions" provision "concerns a specific type of work, namely, that caused by changed conditions." There is, however, a conflict relating to whether or not changed conditions existed. This conflict was established by a comparison of the numerous documents and affidavits which indicate the existence of the changed conditions with Bacon's deposition testimony to the effect that no changed conditions existed and that the soil borings accurately showed the water and sand conditions. If this essential factor, *i.e.*, changed conditions, should not be established, Pontarelli could not retain the payments it received for the alleged "extras." The inability of Pontarelli to retain the payments for the alleged "extras" arises from the contract terms which include:

"If at any time it shall appear that the Sanitary District has made any illegal or excess payments to the Contractor which may have been included in a progress estimate or in the final estimate of the Engineer, then the Contractor hereby agrees to repay on demand to the Sanitary District the amount or amounts so paid."

The allegations that plaintiff had waived formal approval by the Chief Engineer or the Board of Trustees of the modification of the contract terms would then be unavailing as the essential requirement of the changed conditions clause, *i.e.*, changed conditions, would be missing. Thus, any payments received by Pontarelli for "extras" would be "illegal or excess."

As there is a genuine issue of material fact the granting of summary judgment on Count IV was improper.

In Count V plaintiff alleged a cause of action against Pontarelli for breach of express and implied warranties. Plaintiff specifically contends on appeal that Pontarelli warranted that the work would be performed in a proper, good, sound and workmanlike manner, that all materials would be furnished, compensation would be accepted only for the labor, tools and materials actually provided and that the sewer would be fit for its intended use. In Count VI plaintiff alleged a cause of action for breach of contract in that Pontarelli represented that it would properly perform the contract but did not, and that the sewer is not fit for the purpose for which it was intended. In Count VII plaintiff contended that Pontarelli carelessly and negligently carried out the construction of the project. These counts are considered together because the principles which control their disposition are the same. Pontarelli's response to these conten-

tions is that the determination of plaintiff's Chief Engineer that the work had been satisfactorily completed is binding upon plaintiff unless impeached by fraud.

■■ It must be pointed out that these counts contain no allegation of fraud against Scheidt. Pontarelli makes much of the fact that the contract gave broad and sweeping powers to Scheidt, the Chief Engineer. While that is true, the contract also contained the following provisions:

"The Contractor shall furnish the maintenance bond or bonds, when called for under the contract, in the amount and for the term specified in the Detail Specifications, to make good at his own expense any excessive wear to any parts or any defects in, or damages to any equipment or work specified which may arise from faulty materials, design or construction, or from the inability of the equipment or work to successfully perform all the requirements of the specifications.

\* \* \*

The release of any portion or all of the retained percentage provided for under this article shall not be construed as a waiver by the Sanitary District of its right to hold the Contractor and his surety liable for any and all obligations under the terms of the contract and bond.

\* \* \*

If at any time it shall appear that the Sanitary District has made any illegal or excess payments to the Contractor which may have been included in a progress estimate or in the final estimate of the Engineer, then the Contractor hereby agrees to repay on demand to the Sanitary District the amount or amounts so paid."

These contract provisions reveal the intent of the parties to eliminate the absolute binding effect of final acceptance of the work. Thus, Pontarelli's defense to Counts V, VI and VII which is predicated upon such theory is ill-founded as applied to this case.

Because Pontarelli was not entitled to judgment as a matter of law on Counts V, VI and VII, genuine issues of material fact remain. Those issues include but are not limited to the question of whether or not the defects and faults in the sewer resulted from improper design by plaintiff or faulty construction by Pontarelli.

■■ Plaintiff contends that Count VIII properly pleaded a cause of action for unjust enrichment due to a mistake of fact. The nature of this type of cause of action was discussed in *Willens v. City of Northlake* (1958), 19 Ill.App.2d 316, 318, 152 N.E.2d 486, 487, where the court stated:

"This court said in Board of Trustees of Police Pension Fund of Glen Ellyn v. Village of Glen Ellyn, 337 Ill.App. 183, 194-195: 'It is an elemental principle of law, applied in both law and equity courts, that where one person has received money * * * which belongs to another, under such circumstances that in equity and good conscience he ought not to retain it, recovery will be allowed.' The recovery at law, the court said (Page 195), was 'on the basis of a quasi-contract, or contract implied in law.'"

Further comment is found in *Salvati v. Streator Township High School District No. 40* (1964), 51 Ill.App.2d 1, 4-5, 200 N.E.2d 122, 124, where the court explained:

"Where money is paid under a mistake of fact, which would not have been paid had the facts been known to the payors, it may be recovered. (J. S. Hulse Hardware Co. v. American Express Co., 65 Ill.App. 596; Wolf, Executor v. Beaird, 123 Ill. 585, 15 N.E. 161; Willens v. City of Northlake, 19 Ill.App.2d 316, 152 N.E.2d 486). The fact that the person to whom the money was paid was not guilty of deceit or unfairness, but acted in good faith, would not prevent recovery of such sum (Jenson v. Muting, 255 Ill.App. 514), nor does negligence of the payor preclude a recovery in such case. (Devine v. Edwards, 87 Ill. 177.)"

■■ Plaintiff's complaint contained the necessary allegations in this regard. Pontarelli contends here, as he did with reference to Counts I and III, that plaintiff had knowledge of the performance and therefore could not have paid by mistake. The theory of imputed knowledge as applied to this case in its present posture has been discussed earlier. It has been determined that the theory is invalid as applied to other counts and for the same reasons the theory does not embody a valid defense to this count. Thus, summary judgment in favor of defendant on this count was also improper.

With respect to Count IX, the action against the surety, Pontarelli contends that because no cause of action against it existed, no cause of action existed against Fidelity. Except as to Count II, Pontarelli's premise is incorrect. Thus, upon this theory Fidelity cannot prevail.

Fidelity did, however, file its own brief in this appeal and therein advanced its theory of non-liability. Fidelity contends that it was released of its obligations under the bond by plaintiff's release of the contract funds.

One of the keystones of this theory is the extent to which plaintiff is bound by its Chief Engineer's determination that Pontarelli had satisfactorily completed the work. Count IX incorporated the allegations of

Count I which state that Scheidt committed a fraud upon plaintiff in connection with the performance of this contract. Fidelity conceded that Scheidt's determination loses binding force if impeached by fraud. Thus, the question of Scheidt's fraud is crucial, but in that regard there is a genuine issue of material fact.

Fidelity also contends that plaintiff's allowance of defective performance and payment with knowledge of that defective performance operated to release Fidelity. Basic to this theory is knowledge on the part of plaintiff of the actualities of performance. This knowledge would have to come to plaintiff by imputation, but, as discussed earlier the theory of imputed knowledge is invalid as applied to this case in its present state. Additionally, the Supreme Court in *Turk v. United States Fidelity & Guaranty Co.* (1935), 361 Ill. 206, 197 N.E. 765, was confronted with language in a contractor's bond which was substantially the same as that found in the instant case. There the surety contended that it could not be held for damages which exceeded any unpaid portion of the contract price. The Court, at 361 Ill. 212-213, 197 N.E. 767, stated:

> "The liability of the defendant as surety, within the limit of the principal sum of the bond, is coextensive with that of the contractor, whose full and faithful performance has been guaranteed. It is conceivable that a breach might occasion damages equal to or greater than the entire contract price, and that such a breach might occur after all but the last payment had been made. It might even happen, through fraudulent concealment or latent defects, that a breach might not be discovered until after all the money had been paid. If no recovery could be had on the bond under such circumstances, those words in the bond which purport to indemnify the owner against 'all damages or forfeitures which may be sustained by reason of the non-performance or mal-performance on the part of the said principal' would be entirely nullified. Such a construction would be unreasonable and will not be approved."

*Accord, Village of Downers Grove v. American Surety Co.* (1920), 218 Ill.App. 608, 614.

Thus, the granting of summary judgment on Count IX was improper as at least one genuine issue of material fact existed and defendants were not entitled to judgment as a matter of law.

This opinion has pointed out various genuine issues of material fact. The discussions herein are not, however, intended to delimit the factual issues to be resolved at trial, but are only intended to demonstrate the inappropriateness of the order granting summary judgment.

The judgment of the Circuit Court is affirmed to the extent it applies to Count II, but as to the remainder of the complaint, the judgment is reversed and the cause remanded for further proceedings not inconsistent with the views herein expressed.

Affirmed in part, reversed in part.