**RESOLUTION TRUST CORPORATION, Plaintiff,**

v.

**O'BEAR, OVERHOLSER, SMITH & HUFFER, an Indiana partnership, d/b/a O'Bear, Overholser, Smith, Huffer & Rider, John J. Barber, Opal F. Bowman, William H. Bradshaw, John P. Erickson, Dean A. Hudson, Carl D. Overholser, Fred R. Rodkey, and Raymond J. Todd, Defendants.**

No. 2:93 cv 164 JM.

United States District Court,
N.D. Indiana,
Hammond Division.

April 17, 1995.

William A. Spence, Steven A. Ramirez, Chicago, IL, for plaintiff.

Robert D. Brown and Richard A. Mayer, Merrillville, IN, George L. Hanna, Lafayette, IN, James H. Falk, Jr., Washington, DC, David A. Rosenthal, Lafayette, IN, Christine

A. DeSanctis and Robert E. Poynter, Lafayette, IN, for defendants.

### ORDER

MOODY, District Judge.

This represents the second, and penultimate, chapter written by the court in this litigation—the trial being all that remains.[1] The court now has before it numerous motions, including three motions for summary judgment. The summary judgment motions are as follows: Carl Overholser and O'Bear, Overholser, Smith & Huffer [the "attorney defendants"] move for summary judgment against the Resolution Trust Corporation [the "RTC"]. Overholser, joined by John Barber, Opal Bowman, John Erickson, Fred Rodkey, Raymond Todd and Dean Hudson [the "director defendants"] move for summary judgment with regard to the RTC's claims against Todd, in his capacity as appraiser, and against all of the director defendants pursuant to 12 U.S.C. § 1821(k).[2] The RTC moves for partial summary judgment concerning the affirmative defenses asserted by the defendants. The pending non-dispositive motions all relate to the summary judgment motions; accordingly, the court takes up those motions in the context of the summary judgment motions, which are discussed below *seriatim*.

### I.

"[S]ummary judgment is appropriate—in fact, is mandated—where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that 'no reasonable jury could find for the non-moving party.'" *Dempsey v. Atchison, Topeka and Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir.1994) (citations omitted). "The burden rests squarely with the party moving for summary judgment to demonstrate that there is an absence of evidence to support the nonmoving party's case." *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir.1994). The court views the facts presented on a motion for summary judgment in a light most favorable to the non-moving party, resolving all doubts in favor of that party. *See id.* "On the other hand, summary judgment must be entered 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Id.* (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986)). In all of this, "the judge's role is not to evaluate the weight of the evidence or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact." *Id.*

### II.

This case involves the failure of Hometown Federal Savings Bank and the five high-risk loans that led to that failure. On June 8, 1990, the RTC was appointed receiver for Hometown. On June 4, 1993, RTC filed this lawsuit. As the court has previously explained, RTC alleges: (1) that the director defendants were grossly negligent in their management of Hometown, (2) that the attorney defendants committed legal malpractice in advising Hometown, and, (3) that defendant Todd committed professional malpractice in his capacity as chief appraiser for Hometown. *See Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. 1270, 1274 (N.D.Ind.1993). All of RTC's claims relate to Hometown's involvement in five specific loans in 1983–84.[3] Additional facts are discussed as relevant below.

### III.

The court first takes up whether RTC can maintain its state-law claims against the at-

---

1. See *Resolution Trust Corp. v. O'Bear, Overholser, Smith & Huffer*, 840 F.Supp. 1270 (N.D.Ind. 1993) for the earlier installment.

2. Dean Hudson moved separately to join the other director defendants' motion for summary judgment. That motion is **GRANTED.**

3. The court says "loans" despite the defendants' argument that the relevant transactions were "participations," not "loans." What is involved are large loans in which Hometown participated with other institutions. The court will continue to refer to the transactions as "loans" in this order.

torney defendants and defendant Todd. The attorney and director defendants each challenge the timeliness of RTC's state-law claims in their respective summary judgment motions. The court now concludes that these claims are, in fact, time-barred. Because the same analysis applies regarding the timeliness of RTC's state-law claims against both the attorney defendants and Todd, the court discusses these claims together.

### A. Adverse domination does not apply to salvage RTC's state-law claims.

■ Ruling on defendant Todd's motion to dismiss, the court held that RTC's state-law claims did not accrue against Todd until Hometown's board was no longer dominated by the director defendants. See O'Bear, Overholser, Smith & Huffer, 840 F.Supp. at 1283–85. Limited to the allegations of the complaint, the court accepted that the defendants' domination continued until RTC was appointed receiver in June, 1990. See id. at 1284. The court stands by its conclusion that the Indiana courts would apply adverse domination to calculate the accrual of RTC's state-law claims; however, the record on summary judgment indicates that the defendants' domination of Hometown's board was over well before RTC's appointment as receiver. Although the legal context in which the court takes up the timeliness of RTC's state-law claims was thoroughly set out in the court's prior order, to make the court's current conclusion clear the court will briefly summarize that discussion.

■ The Financial Institutions Reform, Recovery, and Enforcement Act ["FIRREA"] sets the limitations period "with regard to any action brought by the [RTC] as conservator or receiver." See 12 U.S.C. § 1821(d)(14). Section 1821(d)(14)(A) provides that the limitations period is

\* \* \* \* \* \*

(ii) in the case of any tort claim, the longer of—

(I) the 3–year period beginning on the date the claim accrues; or

(II) the period applicable under State law.

The statute states that

the date on which the statute of limitation begins to run on any claim . . . shall be the later of—

(i) the date of the appointment of the [RTC] as conservator or receiver; or

(ii) the date on which the cause of action accrues.

12 U.S.C. § 1821(d)(14)(B). FIRREA "does not revive stale state-law claims: that is, if the limitations period on a state claim has run before RTC is appointed conservator or receiver, RTC may not bring that claim under FIRREA." O'Bear, Overholser, Smith & Huffer, 840 F.Supp. at 1283.[4]

■ With regard to RTC's state-law claims against Todd, the court previously held that the relevant state-law limitations period is the two-year period imposed for professional and/or general negligence. See id. (citing IND.CODE §§ 34–4–19–1 and 34–1–2–2(1)). The court noted that these two-year periods would have run out before RTC was appointed receiver if they had begun running when Todd was allegedly advising Hometown about the problem loans. Id. As noted, however, the court concluded that the limitations period did not begin to run at that time. Id. at 1284. Relying on Indiana's discovery rule for accrual of actions, the court reasoned that

as a corporate entity, Hometown can only 'discover' an injury to itself, and act to redress that injury, to the extent that those individuals who control it know of the injury and are willing to act on that knowledge. When, as here, the board of a corporate entity is dominated by those whose own malfeasance might be revealed in the course of litigating a complaint, it follows the entity has not 'discovered' the injury to its interests in any meaningful way. Put another way, a corporate 'plaintiff' has not discovered alleged negligence

---

**4.** In September, 1994, this rule was changed with regard to tort claims "arising from fraud, intentional misconduct resulting in unjust enrichment, or intentional misconduct resulting in substantial loss to the institution." Pub.L. No. 103–328, § 201(a), 108 Stat. 2338, 2368 (1994). The change is inapplicable here, where RTC filed suit more than a year before the change was effected.

until that negligence is discovered by those who can be expected to act to redress the entity's interest.

*Id.* Applying this reasoning, the court reached the conclusion mentioned above that Hometown's state-law claims did not accrue, *i.e.* that the limitations period for the state-law claims did not begin to run, until the adverse domination of Hometown's board was ended by the appointment of RTC as receiver. *See id.* at 1284–85. This analysis is equally applicable to RTC's professional and general negligence claims against the attorney defendants.[5]

In the prior order, the court distinguished *INB National Bank v. Moran Electric Service, Inc.,* 608 N.E.2d 702 (Ind.Ct.App.1993). *See O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. at 1285. In *INB,* the Indiana Court of Appeals refused to apply presidential domination—a doctrine analogous (though not identical) to adverse domination—to toll the accrual of claims by officers and shareholders of a corporation who knew of, and acquiesced in, embezzlement by the corporate president. 608 N.E.2d at 708. This court reasoned that

> RTC, plaintiff in this case, did not acquiesce to Todd's alleged misconduct, and was not in any position to do so. Accepting the allegations of the complaint as true, those in position to know and acquiesce in Todd's negligence have been named as defendants in this action.

*Id.* at 1285. This reasoning would apply in equal force to the attorney defendants' alleged negligence. The reasoning is sound.

Based on the current record, however, it appears that the court's reasoning does not lead to the conclusion reached in the court's prior order. Specifically, it is now clear that the named defendants were not the only ones in a position to—on behalf of Hometown—know of, and acquiesce in, the alleged negligence of the state-law defendants.

■ As early as 1984 the RTC's predecessor regulatory body, the FHLBB, became concerned about Hometown's involvement in the five loans at issue. *See* Attorney Defendants' Ex. 9 at ¶ 3.[6] As a result of an FHLBB investigation, in 1985 the FHLBB and Hometown's directors entered into a supervisory agreement. *See id.* at Ex. A. The agreement indicated that FHLBB was "of the opinion that Hometown ha[d] violated certain of the laws or regulations to which the institution is subject and/or has engaged in certain unsafe and unsound practices which would provide grounds for the initiation of formal enforcement proceedings against Hometown by the FHLBB." *Id.* FHLBB determined not to initiate enforcement proceedings, however, instead imposing certain requirements concerning Hometown's procedures for assuring regulatory compliance and for appraising property that secured Hometown's loans. *See id.* The FHLBB agent in charge of the agency's dealings with Hometown attests that "[a]t the time of the execution of the Supervisory Agreement, ... the FHLBB was fully aware of the circumstances surrounding Hometown's participation loans...." *Id.* at ¶ 4.

---

**5.** There is no direct Indiana authority equating adverse domination with the discovery rule, as the court has done here. The conclusion follows naturally, however, from careful consideration of the two rules, as discussed in this court's prior order, *see O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. at 1284, and by other district courts applying analogous rules in other states, *see, e.g., Resolution Trust Corp. v. Farmer,* 865 F.Supp. 1143, 1154 (E.D.Pa.1994) (applying adverse domination "within the contours of the discovery rule" in Pennsylvania); *Resolution Trust Corp. v. Hecht,* 833 F.Supp. 529, 532 (D.Md.1993) (predicting "that the Maryland Court of Appeals will consider the adverse domination doctrine to be a corollary of the established discovery rule"); *Federal Deposit Ins. Corp. v. Gonzalez-Gorrondona,* 833 F.Supp. 1545, 1557 (S.D.Fla.1993) (concluding that Florida's discovery rule is corollary

to adverse domination). There is no need to subject the parties to the expense and delay inherent to certification of this issue to the Indiana Supreme Court, as the attorney defendants have moved to do. That motion is **DENIED.**

**6.** The FHLBB is actually the direct predecessor of the Office of Thrift Supervision ["OTS"], which was created by FIRREA to carry on the FHLBB's work. RTC acts as the agent of OTS, which appoints RTC to resolve the affairs of failed, or failing, federally-insured institutions. *See Resolution Trust Corp. v. Cheshire Management Co.,* 18 F.3d 330, 333 (6th Cir.1994) (describing FIRREA's effect on the distribution of responsibilities among federal banking regulators).

FHLBB's concerns persisted, and, on March 27, 1987, FHLBB entered into a Consent Agreement with Hometown's directors that set the stage for the conversion of Hometown from a savings-and-loan association to a stock savings bank. *See* Director Defendant's Ex. K (OTS memorandum stating history of Hometown's regulation). In the March, 1987 agreement, FHLBB stated that Hometown's failure to comply with applicable regulations justified extraordinary steps; the agreement is clear that grounds existed for the creation of a conservatorship or receivership. *See* Director Defendant's Ex. 19. The FHLBB nonetheless determined again that it would work with, rather than against, the then-directors. *See id.* The 1987 Consent Agreement took a step not taken in earlier agreements, however: it provided that a Supervisory Agent be appointed to oversee Hometown's conversion. *See id.* By the agreement, the directors did "resolve and agree to resign from the board at the request of the Agent, at such time and in such order as the Agent shall request." *Id.* Any vacancy in the Board was to be filled by "electing as director a person recommended by the Agent." *Id.*

█ Thus, although the directors retained day-to-day responsibility for operations of Hometown, the FHLBB, *via* its Supervisory Agent, obtained general supervisory power over the board, including the right to request the resignation of any board member. The court's conclusion in this regard echoes the FHLBB's understanding of the agreement, attested to by its Supervisory Agent for Hometown as follows:

8. As a result of and subsequent to the March 27, 1987 Consent Agreement, the FHLBB assumed and acquired complete managerial and operational control of Hometown and its Board of Directors.

9. Pursuant to the Consent Agreement, the FHLBB could remove any or all of Hometown's directors and replace any or all of these directors with directors chosen by the FHLBB.

Attorney Defendant's Ex. 9.[7] Also relevant is the fact that in April of 1988, the FHLBB approved retention of the then-directors to be directors of the converted institution. *See* Director Defendants' Ex. F (memorandum to the Supervisory Agent from an assistant).

These undisputed facts cannot support the conclusion that nobody in a position to redress Hometown's interests could have, or should have, timely discovered and pursued Hometown's state-law claims against the attorney defendants and Todd. Government regulators were in that position. Starting on March 27, 1987 with the execution of the Consent Agreement, the FHLBB could have stepped into Hometown's shoes as a receiver or conservator. Alternatively, from that date on, the FHLBB could have demanded that the board members pursue Hometown's state-law claims or else submit their resignations. Instead, the FHLBB decided to work with the directors, essentially in the role of super-director. This was FHLBB's right. However, domination of Hometown's board of directors by the current defendants existed at that point only to the extent that the FHLBB tolerated it. Even after the 1987 Agreement expired the following year, the directors remained in power over the converted institution only upon approval of the regulators.

█ The RTC, the FHLBB's successor, cannot now assert adverse domination to toll the accrual of Hometown's state-law claims. If it could, the limitations period for state-law claims in cases such as this would be wholly in the hands of the government regulators, who could extend it for so long as they chose to continue to work with allegedly malfeasant directors. This would undermine the basic goal of the limitations period: to stave off stale claims and the problems of proof endemic to those claims. *See McCarty v. Hospital Corp. of America,* 580 N.E.2d 228, 231 (Ind.1991) ("The policy upon which statutes

7. RTC has moved to strike these statements from Young's affidavit because they assert legal conclusions. The court does not interpret, or rely upon, Young's affidavit in this way. The statements are considered, and are relevant, simply as a statement of what the FHLBB believed its powers to be. Accordingly, the motion to quash these portions of Young's affidavit (and paragraph 10 of the affidavit as well) is **DENIED.**

of limitation are premised" is "guarding against stale claims, lost evidence and faulty memories of witnesses."); *see also Farm Credit Services v. Decker*, 624 N.E.2d 491, 496 (Ind.Ct.App.1993) (" 'The State's interest in a self-executing statute of limitations is in providing a repose for potential defendants and in avoiding stale claims.' ") (citation omitted). The court does not believe Indiana courts would sanction this result. The court now holds that the limitations period for Hometown's state-law claims began to run on March 27, 1987 and, accordingly, that Hometown's state-law claims against the attorney defendants and Todd were stale, and could not be revived by FIRREA, when RTC became receiver for Hometown in June of 1990.

**B.** *Authority from other jurisdictions does not compel a different result.*

The court acknowledges that other district courts faced with similar facts have held that a regulatory agency's knowledge of malfeasance does not, as a matter of law, negate adverse domination. *See, e.g., Resolution Trust Corp. v. Farmer*, 865 F.Supp. 1143, 1158–59 (E.D.Pa.1994); *Resolution Trust Corp. v. Hecht*, 833 F.Supp. 529, 533 (D.Md. 1993); *Resolution Trust Corp. v. Fleischer*, 826 F.Supp. 1273, 1278 (D.Kan.1993); *Resolution Trust Corp. v. Kerr*, 804 F.Supp. 1091, 1096 (W.D.Ark.1992); *Federal Deposit Ins. Corp. v. Howse*, 736 F.Supp. 1437, 1442 (S.D.Tex.1990). In each of these cases, the courts were applying their interpretation of state law other than Indiana's. Furthermore, to the extent that the cases explain their conclusions, they rely on facts inapplicable here, or on premises that this court rejects.

■ For example, two courts note that the regulators could not themselves bring suit on behalf of the institution and that, *de facto*, domination of the board persisted until receivership. *See Fleischer*, 826 F.Supp. at 1278; *Howse*, 736 F.Supp. at 1442. That the regulators could not themselves bring suit, however, seems of little moment when they have full power to alter, at will, the board's composition. If *de facto* domination of the board persists by the regulators' choice, the regulators cannot later take advantage of

adverse domination, in essence citing their own approval of the purported wolves as guardians of the coop. The institutional entity (to indulge the legal fiction) does have knowledge of its claims at the point the "super-director"-regulator knows of the claim. Anything else would do violence to the limitations statute.

■ Neither does the court accept the premise that the regulators' incentive to sue is so much different than would be the incentive for untainted directors. *Compare Fleischer*, 826 F.Supp. at 1278. The FHLBB had a duty to minimize Hometown's losses so as to avoid a drain on the fund insuring deposits. *See Federal Deposit Ins. Corp. v. Bierman*, 2 F.3d 1424, 1439 (7th Cir.1993) (duty of regulators to manage institutions so as to replenish any drain upon the federal depository insurance fund). That duty is incentive enough for the FHLBB to use its powers to assure that the entity fully pursues any state-law claims it possesses. As noted, the FHLBB was fully aware of the circumstances surrounding the loans at issue here. This is reflected in the Supervisory Agent's affidavit and in the central place of regulatory compliance and the adequacy of appraisals in the agreements the FHLBB entered with Hometown's directors. The FHLBB should have been on notice of potential professional malpractice claims Hometown had in these areas and it had every incentive to assure that Hometown pursued those claims.

Finally, the court notes that there is no evidence here that the directors inhibited the supervisory agent's ability to do his job. *Compare Howse*, 736 F.Supp. at 1442. Just the opposite. The Supervisory Agent attests that "[f]ollowing execution of the Consent Agreement, the Board of Directors of Hometown cooperated fully with the FHLBB, and did not interfere with or otherwise inhibit the FHLBB's management and control of Hometown." Attorney Defendant's Ex. 9 at ¶ 10. The Supervisory Agent was surely best positioned to judge the directors' cooperation. That cooperation is further evidence in this case that the FHLBB could have assured that Hometown pursue its state-law claims.

For all of these reasons, the court is unconvinced that the decisions of our cousin

courts compel a different conclusion than that the court reaches today.

### C. The doctrine of fraudulent concealment does not apply.

 Neither can the RTC find refuge in the notion of fraudulent concealment. RTC argues that, as directors, Todd and Overholser were bound to disclose their alleged professional malfeasance and that the limitations period was tolled until they did so. It is true that "[t]he doctrine of fraudulent concealment operates to estop a defendant from asserting a statute of limitations defense when that person, by deception or a violation of a duty, has concealed material facts from the plaintiff thereby preventing discovery of a wrong." *Keesling v. Baker & Daniels,* 571 N.E.2d 562, 565 (Ind.Ct.App. 1991). *Keesling* is clear that such concealment may arise from active efforts to conceal or from "a failure to disclose material information when a fiduciary or confidential relationship exists." *Id.* There is no question that, as board members, Overholser and Todd were in a fiduciary relationship with Hometown. The problem for the RTC is that any alleged malfeasance by Overholser and/or Todd was not concealed (actively or by nondisclosure) from the FHLBB, who the court charges with both knowledge of Hometown's state-law claims and the power to assure that Hometown pursue those claims. As discussed above, the regulators surely knew, or through reasonable diligence could have ascertained (on their own or by forcing the directors to investigate) that professional malpractice claims might be in the offing. They did not pursue those claims, or assure that Hometown's directors do so. RTC cannot now rely on Overholser and Todd's alleged failure to disclose to co-directors to avoid either those facts or the court's conclusion today.

To sum up, that conclusion is that RTC's state-law claims against the attorney defendants and Todd are time-barred and those defendants are entitled to summary judgment on those claims.

## IV.

The court next takes up the director defendants' motion for summary judgment against RTC on RTC's 12 U.S.C. § 1821(k) claim. The director defendants make three arguments in support of summary judgment: (1) that the director defendants were not, as a matter of law, grossly negligent in the execution of their duties, as required by § 1821(k); (2) that the director defendants were released from liability concerning several of the loans; and, (3) that RTC does not own Hometown's claims against them. None of these arguments has merit.

### A. Gross negligence.

 The director defendants argue that, as a matter of law, they were not grossly negligent in the execution of their duties as directors. RTC responds with expert affidavits that attest to the contrary. The court has already held that

> gross negligence, for the purposes of this lawsuit, requires that the defendants, in the face of a manifest duty, acted with reckless disregard for the consequences.

*O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. at 1279. The RTC raises triable issues of fact with regard to this standard.[8]

---

8. The director defendants seek to import the Indiana business judgment rule into the analysis of their conduct under § 1821(k). While it is analogous to the § 1821(k)-standard the court previously announced for this case, the court elects not to consider cases under the Indiana business judgment rule.

Section 1821(k) creates, on behalf of RTC, a federal cause of action for gross negligence by directors of federally insured savings institutions. *See* 12 U.S.C. § 1821(k). The court previously held that § 1821(k) preempts state-law claims. *See O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. at 1277. The Seventh Circuit subsequently reached the same conclusion with regard

to § 1821(k) suits involving the directors of institutions that, like Hometown, have federal charters. *See Resolution Trust Corp. v. Chapman,* 29 F.3d 1120, 1122–25 (7th Cir.1994). Thus, it is a federal standard by which the directors here must be judged.

Section 1821(k) does direct the court to state law concerning the definition of "gross negligence." The court previously reviewed Indiana law, ultimately setting forth the test related in the text. The Indiana business judgment rule does not present so different a standard. As codified at IND.CODE § 23–1–35–1, it provides that "[a] director is not liable for any action taken as a

In support of summary judgment, the director defendants point to the well-publicized 1980 relaxation of the standards by which savings-and-loan institutions such as Hometown could lend money. Relying primarily on their own affidavits, they point to the process by which Hometown took advantage of those relaxed standards to become involved in the five loans at issue here. *See* Director Defendants' Exs. 2–9. The director defendants assert that these attestations establish that they did carefully consider those transactions. They argue:

> Each of the five participation proposals and packages were screened and analyzed by the president [*i.e.,* director Todd]. Each participation proposal and package was presented to the executive board. Each participation was fully allowed by law, each participation proposal and package was fully received by each director, and no participation was entered into until a board representative personally inspected the participation property and responded favorably back to the board.

The director defendants also point to the fact that they were evaluated and approved by the FHLBB in 1988 (as already noted in this order) to head Hometown as a converted stock savings institution. The suggested inference is that FHLBB would not have allowed their continued control if they had been grossly negligent in performing their duties.

The RTC responds to this evidence with expert affidavits. Chief among these is the affidavit of Michael Harris. RTC Ex. B. Harris is a partner in an Indiana law firm. *Id.* at ¶ 3. He has represented a number of financial institutions, two in the capacity of general counsel. *Id.* at ¶ 4. He has also served on the boards of several financial institutions. *Id.* at ¶ 6. Harris has been retained by RTC as an expert in this case. The court concludes that Harris's experiences representing and serving on the boards of financial institutions qualify him to offer expert testimony concerning the duties of directors to such institutions. The court further concludes that the nature and scope of the duties owed a financial institution by its directors is a matter beyond the ken of the average juror, or the court. This is all that is required for the admission of expert testimony (on summary judgment or otherwise). *See Buscaglia v. United States,* 25 F.3d 530, 533 (7th Cir.1994); Fed.R.Evid. 702.[9]

Harris concludes that the director defendants were, indeed, reckless in the face of manifest duties. RTC Ex. B at ¶¶ 9–10, 13. He states that they "recklessly ignored their own polices and procedures in approving the Five Loans" and that they relied excessively on information submitted ... by the loan brokers, borrowers, and by the lead lenders.

director, or any failure to take any action, unless ... the breach or failure to perform constitutes willful misconduct or recklessness." Where the federal and state standards are so similar, preemption turns out to be a bit of a red herring. Nonetheless, for the sake of clarity the court sticks by its prior statement of the rule applicable in this case. Having pronounced the relevant standard, rather than introduce another body of case law, *the court concentrates on whether, as a matter of law, the culpability of the directors is* established by that standard.

9. The attorney defendants have moved to strike Harris's affidavit. Director defendant Bradshaw joined that motion. The gist of the defendants' argument against the affidavit is that it is conclusory and not supported by fact. With regard to expert affidavits, " '[a]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process.' " *Hammann v. United States,* 24 F.3d 976, 982 (7th Cir.1994) (quoting *Mid–State Fertilizer Co. v. Exchange*

*Nat'l Bank of Chicago,* 877 F.2d 1333, 1339 (7th Cir.1989)). On the other hand, as the Seventh Circuit explained in *Mid–State,* "Rule 705 of the Federal Rules of Evidence allows experts to present naked opinions." 877 F.2d at 1339. For the purposes of an affidavit in support, or opposition, to summary judgment, the expert affidavit need only present "a process of reasoning beginning from a firm foundation." *Id.* (citing Fed.R.Civ.P. 56(e)).

Harris's affidavit easily passes muster under this test. It does contain nakedly conclusory statements, but those statements are supported by analysis of why each of the five loans should not have been entered into. That analysis, in turn, is supported by hundreds of pages of financial and other documents that Harris relied upon in drawing these analyses. Harris's characterization of the bottom line carries with it the weight of his well-supported analysis. For that reason, the motion to strike Harris's affidavit with regard to the director defendants is **DENIED.**

RTC Ex. B at ¶¶ 14–15. He also states that the director defendants ignored the duties set out in their own agreements with Hometown and by federal law. RTC Ex. B at ¶ 9. Harris opines that the director defendants "recklessly ignored" the "higher degree of skill and caution ... necessary to underwrite out-of-area condominium development loans." RTC Ex. B at ¶ 17. Harris also suggests that these errors by the director defendants were the proximate cause of substantial damages. RTC Ex. B at ¶¶ 12, 19. The court will not review each of the deficiencies that Harris identifies in the 34 paragraphs of his affidavit discussing the director defendants' failures. Suffice to say that Harris sets out a version of the director defendants' performance different from their own version and that a reasonable jury might accept.

■ The court puts little weight in the director defendants' argument that Harris fails to identify specific regulations violated by them. As discussed above, the March, 1987 agreement between the FHLBB and Hometown explicitly states that Hometown's failures vis-a-vis the five loans justified extraordinary steps, including grounds for the creation of a conservatorship or receivership. See Director Defendant's Ex. 19. The agreement also states, without contradiction, the FHLBB's belief that Hometown had failed to comply with relevant regulations. See id. This document, combined with Harris's affidavit suggesting other duties that were violated, convince the court that RTC is, indeed, entitled to put before a jury whether the director defendants violated such duties "with reckless disregard for the consequences." In this vein, violation of a specific statutory or regulatory duty is not prerequisite to a finding of gross negligence. As for

the argument that they would not have been left in charge were they grossly negligent, that is an argument for the jury, not the court on summary judgment.[10]

**B.** *Release of liability.*

The director defendants' second argument in favor of summary judgment is that when Hometown divested itself of its interest in three of the loans at issue, it released them from liability. They argue that, accordingly, Hometown had no claim against them and so RTC does not. The court disagrees.

■ First, Hometown's actions in purportedly releasing its directors from liability are of dubious relevance to what the RTC may do under § 1821(k). The director defendants rely on the Seventh Circuit's statement in *Chapman* that "[t]he RTC gets no more rights than the firm itself had." *See* 29 F.3d at 1124. This citation is taken somewhat out of context. Strictly speaking, RTC does get more rights *vis-a-vis* an institution's directors than the institution itself had: *i.e.* only RTC may sue under § 1821(k). *Chapman* acknowledged this fact when it noted that RTC, unlike the institution, gets the benefit of national law where national law speaks to a particular point. 29 F.3d at 1124. Director liability is one such point. *See id.* It is doubtful whether Hometown could have, preemptively, undermined Congress's grant to the RTC of a cause of action against Hometown's directors.

■ The court does not dwell on the point, however, because Hometown never did release its directors from liability. First, the directors were not parties to any of the agreements purporting to release them. *See*

10. In their reply brief, the director defendants take issue with Harris's damage estimates. The matter of proof of damages is not raised in their motion itself, or in the brief in support of the motion. The court will not, therefore, take the bait and delve into the damages issue. The court does note that the history of regulatory involvement arising out of the five loans belies the notion that Hometown was not damaged by its involvement with those transactions. Certainly, an issue of fact has been raised whether the directors' decision to enter the loans was the proximate cause of that loss.

Also, the RTC submitted two other expert affidavits, by Stephen Butler and William Weaver, in opposition to summary judgment. The attorney defendants moved to strike those affidavits and director defendant Bradshaw has joined those motions. Because the court does not rely on those affidavits in denying summary judgment to the director defendants, those motions are **DENIED** as **MOOT.** Neither did the court find it necessary to consider the submissions filed by RTC in opposition to the motions to strike. Accordingly, the attorney defendants' motion to strike those submissions (also joined by Bradshaw) is likewise **DENIED** as **MOOT.**

Director Defendants' Exs. 24–26. The agreements are, respectively, between Hometown and Honolulu Federal Savings and Loan Association; between Hometown and Irving Federal Savings and Loan Association; and between Hometown, Aransas Princess Holding, Inc. and Aransas Princess Holdings Limited Partnership. *Id.* In the agreement with Honolulu Federal Savings and Loan, the parties "waive and release each other, their respective agents, employees, attorneys, successors and assigns ... from any and all liability." Director Defendants' Ex. 24. In the agreement with the Aransas entities, the parties likewise absolve each other from lawsuits. Ex. 26. Neither of these releases can be rationally understood to constitute releases between each entity and its own employees, etc., who, as noted, were not parties to the agreements. As for the agreement with (really an assignment to) the Irving Federal Saving and Loan, the fact that Hometown sold its interest in the loan to Irving has nothing to do with Hometown's interest in pursuing its claims against its own directors. Ex. 25. The director defendants' argument on this point is without merit. Perhaps this explains the lack of supporting authority at this point in their briefs.

### C. RTC's ownership of the § 1821(k) claim.

 Finally, the director defendants argue that RTC cannot bring its § 1821(k) claim because that claim was somehow extinguished when Hometown converted in 1988 to a stock savings bank. This argument, like the argument that the directors were released from their liability, is unsupported by legal authority and deserves short shrift.

 The director defendants have failed to identify any evidence in the record that supports the conclusion that Hometown's claims against its directors were "satisfied and discharged" through the conversion process. They simply outline the history of the conversion. The director defendants' argument in this regard is premised on the notion that RTC was appointed receiver of a different entity than that which the director defendants guided into the five problem loans, and, therefore, RTC does not own the claims against them concerning those loans. This premise is negated by the regulation governing Hometown's conversion from a savings-and-loan to a stock savings bank, which states clearly that

[t]he corporate existence of a mutual association converting to a Federal stock association shall not terminate, but the converted association *shall be deemed to be a continuation of the entity of the association so converted.*

12 C.F.R. § 563b.8(d)(3) (1988) (Emphasis added.) The conversion itself, therefore, did not extinguish any claim against the director defendants. Neither is there evidence of an express discharge or satisfaction of the directors' liability to Hometown. The only conclusion available is that when RTC became receiver of Hometown the stock savings bank, it acquired, *via* § 1821(k), a claim for any gross negligence on the part of the institution's former directors with regard to the five loans at issue.

For the reasons given above, the director defendants have failed to make out their case for summary judgment: as a matter of law, RTC owns a viable claim under § 1821(k) that presents a triable question of fact regarding whether the director defendants were grossly negligent when they approved Hometown's involvement with the five problem loans.

## V.

 The court next takes up the RTC's motion for partial summary judgment.[11] RTC asks that the court rule as a

---

11. RTC followed up its original summary judgment motion with an amended brief. It moved for leave to have that brief considered. That motion is **GRANTED.** The court notes that the defendants' opposition briefs address the amended brief, not the original.

The court further notes that, as RTC acknowledged when it denoted its motion as one for "partial summary judgment," when summary judgment is granted on less than an entire claim, it does not result in a "judgment" at all. *See* FED.R.CIV.P. 54(a) (" 'Judgment' as used in these rules includes a decree and any order from

matter law that the defendants cannot be successful in their affirmative defenses of: failure to state a claim, statute of limitations, contribution, recoupment, set off, laches, estoppel, ratification, release, waiver and lack of compensable damages. The court previously ruled that RTC states a timely claim against the director defendants under § 1821(k). *O'Bear, Overholser, Smith & Huffer,* 840 F.Supp. at 1278–81. In this order, the court has ruled that the director defendants were not released from liability. The issue of compensable damages is not an affirmative defense at all, but rather a matter for determination in the course of the RTC's case in chief. The court now holds that, as a matter of law, the director defendants have not established the viability of the other defenses at issue.

■■■ The court does not base its decision on the RTC's convoluted discussion of the various hats it wears. The court rejects the premise that RTC, in its corporate capacity, can purchase claims from RTC, in its receiver capacity, and by doing so extinguish affirmative defenses that potential defendants (director or otherwise) might possess to those claims. This is consonant with the Seventh Circuit's position regarding defenses against bank regulators, which endorses a focus on " 'special considerations of public policy' " and rejects " 'close (and unnecessary) distinctions between the various capacities in which [regulators] operate.' " *Bierman,* 2 F.3d at 1439 (citation omitted).

■■■ The "special considerations" on which *Bierman* focussed concern the responsibilities of regulators who take over a failed institution. Those responsibilities include the duty to manage the institution's assets to cover losses to the federal depository insurance fund allegedly caused by the institution's directors and officers. *Id.* *Bierman* noted the wide discretion Congress has af-

forded regulators to carry out those tasks and the fact that they have no duty to make life easier on the institution's former directors. *Id.* The court concluded that "the discretionary exception to the [Federal Tort Claims Act] and the lack of a duty to the wrongdoers would prevent the assertion of affirmative defense against the FDIC." *Id.* at 1441. Other courts of appeals to address the point agree. *See Federal Deposit Ins. Corp. v. Oldenburg,* 38 F.3d 1119, 1121 (10th Cir.1994); *Federal Deposit Ins. Corp. v. Mijalis,* 15 F.3d 1314, 1324 (5th Cir.1994). Further, while *Bierman* specifically addressed only the defense of mitigation of damages, the court's reasoning applies with equal force to other affirmative defenses at issue here. The RTC may conduct its activities as it sees fit (absent intentional wrongdoing not alleged here).[12]

This is not to say that the RTC is entitled to a windfall by way of double recovery if liability has been set off or satisfied elsewhere. The director defendants fail, however, to identify any evidence suggesting that this would occur here, or, for that matter, any evidence supporting the application of any of their asserted affirmative defenses.

■■■ The director defendants' chosen tack for opposing summary judgment is to challenge the legality of RTC's receivership of Hometown. However, only the institution itself can challenge the appointment of a receiver or conservator, and that challenge must come within 30 days. *See* 12 U.S.C. § 1464(d)(2)(B). Neither of those requirements are met with regard to the director defendants' current challenge. Accordingly, the court cannot consider the director defendants' objections to the appointment of RTC as receiver. *See* 12 U.S.C. § 1464(d)(2)(D) ("Except as otherwise provided in this subsection, no court may take any action for or toward the removal of any conservator or

which an appeal lies.") In these cases, a "partial summary judgment" is "merely a pretrial adjudication that certain issues shall be deemed established for the trial of the case." *See* Notes of Advisory Committee on Rules, 1946 Amendment to Subdivision (d) of Rule 56 (citing *Biggins v. Oltmer Iron Works,* 154 F.2d 214, 217 (7th Cir. 1946) and *Leonard v. Socony–Vacuum Oil Co.,* 130 F.2d 535, 537 (7th Cir.1942)).

12. The exception to this rule is, of course, the statute-of-limitations defense. FIRREA's provision for application of limitations statutes would be read out of the law if federal regulators' inaction as litigants could not be asserted against them.

receiver.")[13] The director defendants also raise the argument, presented in their motion for summary judgment, that RTC does not own the current § 1821(k) claims against them. As discussed already, this argument is without merit.

█ *Bierman* establishes that affirmative defenses directed at the conduct of federal regulators (as regulators) are not viable. The director defendants have failed to raise a triable issue concerning whether failure to assert any of these defenses will somehow result in a double-recovery by RTC. Accordingly, the court rules that, as a matter of law, the director defendants cannot assert their pleaded affirmative defenses. Of course, damage issues will still be in play at trial.

## VI.

Finally both the attorney and director defendants have, anticipating the worst, moved to continue the trial date and for certification for interlocutory appeal in case this order came out against them. Because the court grants the attorney defendants' motion for summary judgment, their motion to continue the trial date is **DENIED** as moot. The director defendants' motion for a continuance and certification is also **DENIED**.

█ Certification for interlocutory appeal of an order such as the court's order on summary judgment *vis-a-vis* the director defendants is appropriate where the court "shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation." 28 U.S.C. § 1292(b). The court is not of that opinion here. The director defendants' summary judgment motion has been denied because: (1) there are genuine issues of fact concerning whether they were grossly negli-

gent, (2) the directors have never been released from any liability they have to Hometown, and, (3) the law is clear that RTC does own the claims against them. On these points, which are indeed controlling, there is not substantial ground for disagreement. For that reason, and because the court believes that trial will best advance the termination of this litigation, the trial of this matter will proceed on May 8, 1995 without interlocutory appeal.

### Conclusion

From this morass, the following emerges for resolution at trial: were the director defendants grossly negligent when they got Hometown involved with the five loans at issue and did any such gross negligence proximately result in damages to the institution. Oral argument on these motions is not necessary. By way of summary, this order accomplishes the following:

- Defendant Hudson's motion to join the director defendants' motion for summary judgment is **GRANTED**.

- The attorney defendants' motion to certify the issue of adverse domination to the Indiana Supreme Court is **DENIED**.

- RTC's motion to strike paragraphs 8–10 of Robert Young's affidavit is **DENIED**.

- The attorney defendant and defendant Bradshaw's motions to strike the affidavits of Michael Harris, Stephen Butler and William Weaver are **DENIED**. The motion to strike the RTC's submissions in opposition to these motions is also **DENIED**.

- The RTC's motion to file an amended brief in support of partial summary judgment is **GRANTED**.

- RTC's motion for oral argument is **DENIED**.

---

**13.** The director defendants' objections are, at any rate, baseless. Typical is the argument that the receivership is unlawful because a senior OTS deputy made the appointment. The director defendants rely for this argument on FIRREA, which provides that "[t]he Director [of OTS] shall have exclusive power and jurisdiction to appoint a conservator or receiver." *See* 12

U.S.C. § 1464(d)(2)(B). The argument ignores another relevant section of the statute, which provides that the OTS Director may "delegate to any employee ... any power of the Director." *See* 12 U.S.C. § 1462a(g)(4)(A) (1990), *redesignated* 12 U.S.C. § 1462a(h)(4)(A) by Pub.L. No. 103–328, § 102(b)(5)(A), 108 Stat. 2338, 2352 (1994).

- The attorney defendants' motion for summary judgment with regard to RTC's state-law claims is **GRANTED.**
- The director defendants' motion for summary judgment is **GRANTED** with regard to RTC's state-law claims against defendant Todd, but **DENIED** with regard to RTC's federal claim against all of the director defendants.
- RTC's motion for partial summary judgment is **GRANTED.**
- The attorney and director defendants' motions (including defendant Hudson's motion) for a continuance of the trial date are **DENIED.**

**SO ORDERED.**