RESOLUTION TRUST CORPORATION,
Plaintiff,

v.

Lydia FRANZ and others, Defendants.

No. 93 C 2477.

United States District Court,
N.D. Illinois,
Eastern Division.

Dec. 15, 1995.

Stephen Novack, Patrick A. Fleming, Karen L. Drizin, Timothy John Miller, James

Edwin Bayles, Jr., Novack & Macey, Chicago, IL, for Resolution Trust Corporation.

Sean Malone Sullivan, Raymond Hugo Groble, III, Ross & Hardies, P.C., Chicago, IL, for Lydia Franz, Steven A. Kuroski, Nicholas Lash.

James Robert Schirott, Schirott & Luetkehans, P.C., Itasca, IL, William J. Harte, William J. Harte, Ltd., Chicago, IL, Charles Frank Marino, David M. Marino, Chicago, IL, for Henry J. Hyde.

John K. Kneafsey, Donald Cahill Shine, Gregory Canard Ward, Nisen & Elliott, Chicago, IL, for Thomas J. Martin.

## *MEMORANDUM OPINION*

BRIAN BARNETT DUFF, District Judge.

On February 1, 1990, the Office of Thrift Supervision ordered Clyde Federal Savings and Loan Association ("Clyde") into receivership and it appointed the Resolution Trust Corporation ("RTC") as Clyde's receiver. On April 23, 1993, the RTC sued Lydia Franz and others ("Defendants") for their alleged conduct as Clyde's officers and directors. The RTC's Complaint has four counts: (I) Negligence With Respect to Duties Owed To Clyde; (II) Gross Negligence With Respect To Duties Owed To Clyde; (III) Breach of Fiduciary Duty Owed to Clyde; and (IV) Breach Of Contract With Clyde. On July 5, 1995, the Defendants moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the reasons discussed below, we grant in part and deny in part their motion.

### I. Background

"[A]t all relevant times prior to February 1, 1990, the [D]efendant[s] comprised a majority of Clyde's Board and the[y] controlled and dominated the actions and decisions of Clyde." Compl. at 9. The RTC alleges that, while the Defendants comprised a majority, they "recklessly" and "with gross negligence" handled Clyde's Options Trading Program, Aransas Loan, and Landbank Loan. *Id.* at 10.

The following allegations concern the Options Trading Program. In 1983, the Defendants "passed a resolution authorizing Clyde's Investment Committee members ... to begin options trading as part of a program Clyde called 'yield enhancement.'" *Id.* at 11. At the time, none of the Defendants had "experience or training in options trading." *Id.* As early as December 1983, the Federal Home Loan Bank Board ("FHLBB") criticized the options trading program. *Id.* at 12. It criticized, among other things, the "improper options writing procedures," "inadequate record-keeping," "absence of limits on options trading," and "violations of applicable federal law." *Id.* Despite the criticisms, the Defendants "failed to properly supervise the yield enhancement program." *Id.* On December 19, 1986, "Clyde entered into a Supervisory Agreement which ... prohibited [it] from trading options." *Id.* at 13. "Clyde experienced losses in excess of $10 million from options trading." *Id.*

The following allegations concern the Aransas Loan. "In early 1984, Clyde funded a $5 million participation in a $28.5 million loan to build luxury, beach-front condominiums in Port Aransas, Texas called the 'Aransas Princess.' The Aransas Princess was the first out-of-state construction loan Clyde ever made." *Id.* "At the time Clyde funded the ... loan, the [Defendants] had delegated full authority to Clyde's Advisory Committee to approve real estate loans." *Id.* However, "none of the [D]efendants on the [Committee] ... had any experience in underwriting, appraising or funding out-of state participation loans for the construction of real property." *Id.* Despite the inexperience, Clyde "failed to establish appropriate written loan policies," and it "relied upon information provided and analyzed by a broker who stood to receive a substantial fee if the Aransas Princess loan were made." *Id.* at 14. "The information and analyses of the broker [were] insufficient and improper" for a number of reasons." *Id.* "The borrower defaulted on the loan on or about October 1, 1985." *Id.* "Clyde lost in excess of $3.7 million on the Aransas loan." *Id.*

The following allegations concern the Landbank Loan. "[I]n the fall of 1984, Clyde

embarked on another out-of-state loan involving a 100% participation in a $10 million pool of first and second residential mortgages on properties located outside of Illinois to be serviced by Landbank Equity Corporation." *Id.* at 15. "The mortgages contained in the Landbank pool were to be 100% insured by private mortgage insurance. [The] Defendants assumed that such insurance eliminated any risk to Clyde and, allegedly based on that assumption, [they] performed no independent underwriting or analyses of the mortgages comprising the pool." *Id.* The "Defendants' assumption that the private insurance immunized Clyde from risk was incorrect." *Id.* "[T]he Landbank loan went into default and the insurer notified Clyde that many of the mortgages were excluded from coverage." *Id.* "Clyde lost in excess of $3.5 million on the Landbank loan." *Id.*

## II. Standard of Review

When a defendant moves pursuant to Rule 12(b)(6), we accept all well pleaded facts as true and we construe those facts in the light most favorable to the plaintiff. We grant the motion only if " 'it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.' " *RTC v. Fortunato,* 1994 WL 478616, at *1 (N.D.Ill. September 1, 1994) (quoting *Conley v. Gibson,* 355 U.S. 41, 45–6, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957)).

## III. Discussion

### A. Counts I, III and IV

The Defendants argue that, under the Financial Institutions Reform, Recovery and Enforcement Act ("FIRREA"), the RTC may not sue them for negligence, breach of fiduciary duty, or breach of contract. The Defendants rely on *RTC v. Gallagher,* 10 F.3d 416 (7th Cir.1993), in which the court held that FIRREA pre-empts federal common law and establishes a gross negligence standard of liability for officers and directors of failed federally chartered financial institutions. *Id.* at 425. They also rely on *RTC v. Chapman,* 29 F.3d 1120 (7th Cir.1994), in which the court held that, despite FIRREA's savings clause, state law is inapplicable to suits against such officers and directors. *Id.* at

1124–5. Consequently, they argue that we should dismiss with prejudice the RTC's Counts I, III and IV. The RTC constructively concedes by not responding. Therefore, we dismiss with prejudice the RTC's Counts I, III and IV. *See RTC v. Gravee,* 1995 WL 75373 (N.D.Ill. Feb. 22, 1995).

### B. Count II

#### 1. Applying the Statute of Limitations

The Defendants argue that the RTC's gross negligence claim is time barred. For support, they champion *Gravee,* in which the court wrote that "the RTC may not avail itself of the adverse domination doctrine to toll the statute of limitations." 1995 WL 75373, at *5. "Based on the reasoning of *Gravee* and the citations therein, because the RTC was appointed receiver on February 1, 1990, any claims for gross negligence based on actions going back more than five years— i.e., prior to February 1, 1985—would be stale." *Id.* at *6. Consequently, because the RTC only alleges actions prior to February 1, 1985, the Defendants argue that we should dismiss the RTC's claim.

The RTC responds that its claim is not time barred. "[T]he RTC respectfully submits that [the] Defendants' reliance on *Gravee* ... is misplaced." Pl.'s Br. at 11. *Gravee* "was erroneously decided and entailed either a failure accurately to predict Illinois law or an erroneous refusal to predict Illinois law." *Id.* "When one adds (i) Illinois' adoption of a discovery rule grounded in the same policies as that of adverse domination, and (ii) the Illinois decisions recognizing the interrelationship between domination and tolling, it is virtually assured that the Illinois Supreme Court would adopt adverse domination for causes of action based on gross negligence." *Id.* at 12. Consequently, because we should apply the adverse domination doctrine, the RTC argues that we should not dismiss its claim.

■ The applicable statute governing limitations on actions is 12 U.S.C. § 1821(d)(14) ("§ 1821(d)(14)"), and it provides: "(A) Notwithstanding any provision of any contract, the applicable statute of limitations with regard to any action brought by the Corpora-

tion as conservator or receiver shall be— . . . (ii) in the case of any tort claim, the longer of—(I) the 3–year period beginning on the date the claim accrues; or (II) the period applicable under State Law." The applicable state statute of limitations is 735 ILCS 5/13–205, and it provides: "[A]ll civil actions not otherwise provided for, shall be commenced within five years next after the cause of action accrued." In this case, the state statute provides a longer period and, therefore, it governs.

Section 1821(d)(14) further provides: "For [the] purposes of subparagraph (A), the date on which the statute of limitation begins to run on any claim described in such subparagraph shall be the later of—(i) the date of the appointment of the [RTC] as conservator or receiver; or (ii) the date on which the cause of action accrues." In this case, the date of the appointment was February 1, 1990. That date is the later of the two and, therefore, it governs. So, the statute began to run on February 1, 1990, and it ran for five years, making the time bar fall on February 1, 1995.

In this case, the RTC filed the Complaint on April 23, 1993. Apparently, however, the parties agree that we should deem that it filed the Complaint on January 29, 1993. Pl.'s Br. at 3 n. 3. No matter. Either way, the RTC filed before the time bar fell on February 1, 1995.

The analysis, however, is not so simple because "FIRREA can[not] revive stale claims." *RTC v. Krantz,* 757 F.Supp. 915, 921 (N.D.Ill.1991). In *Krantz,* the court considered *Fed. Deposit Ins. Corp. ("FDIC") v. Hinkson,* 848 F.2d 432 (3rd Cir.1988), which "stand[s] for the reasonable proposition that a federal agency . . . takes assignments of claims subject to the claims' 'pre-existing infirmity,' and if the limitations period expired before the assignment, the infirmity is complete." *Id.* (quoting *Hinkson,* 848 F.2d at 434); *see O'Melveny & Myers v. FDIC,* —— U.S. ——, ——, 114 S.Ct. 2048, 2054, 129 L.Ed.2d 67 (1994). Based on that proposition, *Hinkson* held that FIRREA does not revive stale claims. The *Krantz* court "completely agree[d]." *Id.* Subsequently, the *RTC v. Gallagher,* 800 F.Supp. 595, 599

(N.D.Ill.1992), *aff'd,* 10 F.3d 416 (7th Cir. 1993), and *RTC v. Chapman,* 895 F.Supp. 1072, 1075 (C.D.Ill.1995) courts also agreed. Now we agree.

To determine whether the RTC's claim is stale, we must determine when it accrued, and, to do that, we must determine whether the claim sounds in contract, tort, or a hybrid such as a tort arising out of a contractual relationship. The RTC alleges that, based on certain misconduct, the Defendants breached their "express or implied contracts" with Clyde. Compl. at 20. It also alleges that, based on that same misconduct, the Defendants were grossly negligent "with respect to duties owed to Clyde." *Id.* at 17. So the RTC's claim is a hybrid; it is a tort arising out of a contractual relationship. *See FDIC v. Greenwood,* 701 F.Supp. 691, 694 (C.D.Ill.1988). "[W]here a tort arises out of a contractual duty, the period of limitations begins to run at the time the contract is breached, not at the time the damage is sustained or discovered." *Rock Is. Bank v. Aetna Casualty & Surety Co.,* 692 F.2d 1100, 1103 (7th Cir.1982); *see W. Am. Ins. Co. v. Lobianco & Son Co., Inc.,* 69 Ill.2d 126, 132, 12 Ill.Dec. 893, 370 N.E.2d 804 (1977). "The principal reason is that the breach itself is actionable." *W. Am. Ins.,* 69 Ill.2d at 132, 12 Ill.Dec. 893, 370 N.E.2d 804.

The Defendants allegedly breached their contractual duties at three points. First, in 1983, they initiated the Options Trading Program, and, among other things, they failed to heed the FHLBB criticisms. Compl. at 11. Second, in early 1984, they funded the Aransas Loan, and, among other things, they relied on information from an interested broker. *Id.* at 13. Third, in the fall of 1984, they funded the Landbank Loan, and, among other things, they failed to investigate the risk. *Id.* at 15. Therefore, the RTC's cause of action accrued before February 1, 1985, and its claim is stale, unless there is some basis for tolling.

"Generally, the statute is tolled while a corporate plaintiff continues under the domination of the wrongdoers. In other words, the statute does not begin to run until they cease to be directors." 3A James Solheim

and Kenneth Elkins, *Fletcher Cyc. Corp.* § 1306.20 (1994). This is the adverse domination doctrine, and it appears applicable. The problem is that the Illinois courts have not expressly accepted or rejected it.

In *O'Melveny*, the Supreme Court discussed how we should proceed without express guidance from state courts. It wrote that we should anticipate or divine state law.

Unless Congress has otherwise directed, the federal court's task is merely to interpret and apply the relevant rules of state law. Cases like this one, however, present a special problem. They raise issues ... that may not have been definitely settled in the state court jurisdiction in which the case is brought, but that nevertheless must be resolved by federal courts.... [F]ederal judges must do their best to estimate how the relevant state courts would perform their lawmaking task, and then emulate that sometimes purely hypothetical model.

— U.S. ——, 114 S.Ct. at 2056 (Stevens, J. concurring) (paragraph omitted).

■ Similarly, in *Huff v. White Motor Corp.*, 565 F.2d 104 (7th Cir.1977), the Seventh Circuit discussed how we should proceed. It wrote that we "must decide what rule the [Illinois] Supreme Court would adopt ... and apply it." *Id.* at 106; *see Smith v. Pena*, 621 F.2d 873, 878 (7th Cir. 1980) (following the *Huff* rule in a federal question case). "In doing so[,] court[s] should consider all the data which the highest court of the state would consider." *Id.* In 19 *Federal Practice and Procedure* § 4507 (1982), Charles Wright & Arthur Miller, list the data. "In vicariously creating state law ..., the federal court may consider all available legal sources, including the Restatements of Law, treatises, law review commentaries, decisions from other jurisdictions whose doctrinal approach is substantially the same, and the 'majority rule.'" *Id.* at 101–2. "The federal court must keep in mind, however, that its function is not to choose the rule that it would adopt for itself; it must choose the rule that it believes the state's highest court, from all that is known about its methods of reaching decisions, is likely to adopt sometime in the future." *Id.* at 103.

Considering *O'Melveny* and *Huff,* we must "do [our] best" to decide whether the Illinois Supreme Court would adopt the adverse domination doctrine. *O'Melveny,* —— U.S. ——, 114 S.Ct. at 2056; *see Chapman,* 895 F.Supp. at 1076 (deciding whether the Illinois Supreme Court would recognize the doctrine of adverse domination); *but see Gravee,* 1995 WL 75373, at *5 (declining to decide whether the Illinois Supreme Court would recognize the doctrine).

To help us make our decision, we look to Illinois' discovery rule. In *Hermitage Corp. v. Contractors Adjustment Co.*, 166 Ill.2d 72, 209 Ill.Dec. 684, 651 N.E.2d 1132 (1995), the Illinois Supreme Court explained the rule.

Literal application of the statute of limitations ... sometimes produced harsh results, and in response, the discovery rule was developed. When the discovery rule is applied, it 'delays the commencement of the relevant statute of limitations until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused.' This rule developed to avoid mechanical application of a statute of limitations in situations where an individual would be barred from suit before he was aware that he was injured.

*Id.* at 77–8, 209 Ill.Dec. 684, 651 N.E.2d 1132.

We consider if the discovery rule may apply to a hybrid claim such as a tort arising out of a contractual relationship. Illinois courts view the hybrid more like a contract than a tort when they determine its accrual date. *See Id.* at 77, 209 Ill.Dec. 684, 651 N.E.2d 1132. If they view it more like a contract for accrual, they might also view it more like a contract for tolling. And if they do, the discovery rule "does not apply to contract actions." *Smith v. Anson,* 801 F.Supp. 176, 182 (S.D.Ill.1992). In *Hermitage,* however, the court resolved the issue; it applied the discovery rule to a tort arising out of a contractual relationship. *See* 166 Ill.2d 76 and 87, 209 Ill.Dec. 684, 651 N.E.2d 1132. Moreover, the court wrote that "it has applied the discovery rule to several actions, involving the five-year limitations period of 13–205, that could be characterized as torts

arising from contract." *Id.* at 79, 209 Ill.Dec. 684, 651 N.E.2d 1132. In any event, "[t]he reasons behind the discovery rule may support application regardless of how the action is characterized." *Id.*

Next, we consider the standard governing the rule's application. In *Hermitage,* the court discussed the standard. It quoted *Rozny v. Marnul,* 43 Ill.2d 54, 250 N.E.2d 656 (1969), which wrote:

> The basic problem is one of balancing the increase in difficulty of proof which accompanies the passage of time against the hardship to the plaintiff who neither knows nor should have known of the existence of his right to sue. There are some actions in which the passage of time, from the instant when the facts giving rise to liability occurred, so greatly increased the problems of proof that it has been deemed necessary to bar plaintiffs who had not become aware of their rights of action within the statutory period as measured from the time such facts occurred. But where the passage of time does little to increase the problems of proof, the ends of justice are served by permitting [the] plaintiff to sue within the statutory period computed from the time at which he knew or should have known of the existence of the right to sue.

*Id.* at 78, 250 N.E.2d 656.

In this case, we consider whether the rule applies. First, the passage of time has done little to increase the problems of proof. The RTC bases its gross negligence claim on three sets of transactions, each of which is well documented. Moreover, each of the Defendants' roles in those transactions is well documented. Second, the ends of justice are served by permitting the RTC to sue within the statutory period computed from when it discovered that it had the right to sue. *See Chapman,* 895 F.Supp. at 1079. Therefore, we should apply the rule.

Still, however, we must decide when the statutory period began to run. For that, the *Hermitage* court points us to *Nolan v. Johns–Manville Asbestos,* 85 Ill.2d 161, 52 Ill.Dec. 1, 421 N.E.2d 864 (1981). In *Nolan,* the court wrote "that when a party knows or reasonably should know both that the injury has occurred and that it was wrongfully caused, the statute begins to run and the party is under an obligation to inquire further to determine whether an actionable wrong was committed." *Id.* at 171, 52 Ill. Dec. 1, 421 N.E.2d 864; *see Knox College v. Celotex Corp.,* 88 Ill.2d 407, 415–6, 58 Ill.Dec. 725, 430 N.E.2d 976 (1981).

 In this case, we consider when Clyde knew or should reasonably have known of the injury and its wrongful cause. Clyde knew only what its agents told it, and its agents were the Defendants. Normally, courts impute to the principal the knowledge of its agents. *Metro. Sanitary Dist. of Greater Chicago v. Pontarelli & Sons, Inc.,* 7 Ill.App.3d 829, 840, 288 N.E.2d 905 (1st Dist. 1972) (stating the "rule relating to 'imputed knowledge'"). Yet "whenever it appears that the agent[s] ha[ve] a motive or interest in concealing the fact from [their] principal, the latter will not be bound." *Id.* (quoting *Cowan v. Curran,* 216 Ill. 598, 617, 75 N.E. 322 (1905)) (stating the rule relating to adverse agents); *see McKey & Poague, Inc. v. Stackler,* 63 Ill.App.3d 142, 152, 20 Ill.Dec. 130, 379 N.E.2d 1198 (1st Dist.1978) (reaffirming the rule); *see also U.S. v. One Parcel of Land,* 965 F.2d 311, 317 (7th Cir.1992).

Federal courts make the connection between the discovery rule, the adverse agent rule, and the adverse domination doctrine. In *Chapman,* the court made the connection on the basis of Illinois law. It wrote that "the adverse domination doctrine is simply a common sense application of the discovery rule to a corporate plaintiff." 895 F.Supp. at 1078. Similarly, in *RTC v. O'Bear, Overholser, Smith & Huffer,* 886 F.Supp. 658 (N.D.Ind.1995), the court made the connection on the basis of Indiana law. It wrote that "[t]here is no direct Indiana authority equating adverse domination with the discovery rule, as the court has done here. The conclusion follows naturally, however, from careful consideration of the two rules." *Id.* at 665 n. 5. And prior to *O'Melveny,* federal courts also made the connection on the basis of federal common law. *See, e.g., RTC v. Platt,* 1992 WL 672942, at *11 (Oct. 23 1992); *RTC v. Gallagher,* 800 F.Supp. at 600.

The Illinois common law is consistent with the connection. In *Auer v. Meyer Co.*, 322 Ill.App. 244, 54 N.E.2d 394 (1944), the plaintiff alleged "that he was a minority stockholder of Meyer Co., ... that the individual defendants and William Meyer ..., as directors and officers of the Meyer Co., had unlawfully paid bonuses to themselves out of the funds and assets of said corporation; and that the amounts and the dates of payment of such bonuses were unknown to plaintiff and were known only to the defendant corporation and its directors." *Id.* at 249, 54 N.E.2d 394. The "principle question presented ... [was whether the] plaintiff was guilty of laches and that therefore the accounting should be restricted to the period of five years immediately preceding the filing of the complaint." *Id.* at 259, 54 N.E.2d 394.

To analyze the question, the *Auer* court considered whether "the relationship between the Meyers as directors of the Meyer Co. and the plaintiff stockholder [was] such a fiduciary relationship as excused [the plaintiff] from exercise of reasonable diligence to discover the fraudulent misappropriations on the part of the Meyers[.]" *Id.* at 260, 54 N.E.2d 394. The court found that the fiduciary relationship between them was a trust. It further found that "the Statute of Limitations will not begin to run until the discovery of the fraud, or from the time when the fraud could have been discovered by the exercise of reasonable diligence; but in the latter case the failure to use diligence is excused where there is a relation of trust and confidence, rendering it the duty of the party committing the fraud to disclose the truth to the other." *Id.* at 264, 54 N.E.2d 394. The court held that "where directors of a corporation violate a trust in a situation where the directors are in complete control of the affairs, and where no notice of the violation has reached a minority stockholder, the statute of limitations is not a bar to the assertion of the rights of such minority stockholder." *Butts v. Estate of Butts,* 119 Ill.App.2d 242, 255 N.E.2d 622 (4th Dist.1970). Therefore, the plaintiff was not guilty of laches.

The *Butts* case is similar. There, the Robert Butts insurance company sued the estate of Robert Butts, Jr. ("Junior"), its former director and secretary-treasurer, for commingling its funds and advancing himself over $95,000. The company alleged that it did not discover the commingling or advancement until after Junior died. On appeal, Junior's estate argued that the company could not collect some of the funds because the company was time barred by the 5–year statute of limitations. *Id.* at 244, 255 N.E.2d 622. Considering Junior's argument, the court found that "[i]t would be difficult to imagine a situation more appropriate to charge the decedent transferee with notice and thus to make [him] a trustee." *Id.* at 248, 255 N.E.2d 622. This made "the decedent [a] defaulting trustee of a statutory trust." *Id.* at 248, 255 N.E.2d 622. Given that, the court held that *Auer* controls "[t]he issue of the 5–year statute of limitations." *Id.* at 249, 255 N.E.2d 622. And the court concluded that, "[u]ntil the collapse of the [family company] or the death of the decedent, there was no one to assert the trust." Therefore, the company was not time barred.

To be sure, *Auer* and *Butts* alone may "not directly support application of adverse domination doctrine" here. *Chapman,* 895 F.Supp. at 1078; *cf. RTC v. Fiala,* 870 F.Supp. 962, 973 (E.D.Mo.1994) (finding that *Auer* "tolled the running of the limitations period[ ] on 'adverse domination type principles'"); *Clark v. Milam,* 192 W.Va. 398, 402, 452 S.E.2d 714 (1994) (citing *Butts* for the proposition that "the adverse domination doctrine appears to be well settled law in many states"). First, *Auer* and *Butts* applied a tolling principle based on a trust relationship, but courts do not apply the adverse domination doctrine based on such a relationship. *Id.* Second, *Auer* and *Butts* confronted wrongdoers who acted with intent, but we confront alleged wrong-doers who acted with gross negligence. Third, *Auer* and *Butts* confronted few wrongdoers who controlled small family companies, but we confront numerous alleged wrongdoers who controlled a large, federally chartered institution.

■ We believe, nonetheless, that if the Illinois Supreme Court considered whether to adopt the adverse domination doctrine, it would adopt it. First, in *Hermitage,* the Supreme Court "considerably expand[ed] the

discovery rule," and the adverse domination doctrine flows from that rule. 166 Ill.2d at 87, 209 Ill.Dec. 684, 651 N.E.2d 1132 (Freeman, J. dissenting). Second, in light of the *Hermitage* court, we agree with the *Chapman* court that "the principles of equity supporting [*Auer* and *Butts* ] also support application of the adverse domination doctrine." 895 F.Supp. at 1079. Therefore, in this case, we apply the adverse domination doctrine.

We still must decide what adverse domination doctrine the Illinois Supreme Court would adopt. In *Chapman,* the court wrote that "[t]he different versions of the [doctrine] and the rationale[s] behind them have been thoroughly set out and discussed by Judge Rendell in [*RTC v. Farmer,* 865 F.Supp. 1143 (E.D.Pa.1994) ]." 895 F.Supp. at 1079. The court further wrote that "[i]t would be redundant and use unnecessary space for this court to rehash what has already been concisely and completely discussed by Judge Rendell." *Id.* The court concluded that "[t]hat reasoning is hereby adopted." *Id.* If we intended to adopt the *Farmer* court's reasoning, we would not rehash it either. We, however, do not intend to adopt it. Therefore, we will rehash.

The *Farmer* court relied on *FDIC v. Dawson,* 4 F.3d 1303 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2673, 129 L.Ed.2d 809 (1994). In *Dawson,* the court addressed two issues: (1) "[h]ow completely must the wrongdoers dominate their corporation in order to trigger adverse domination tolling;" and (2) "[h]ow culpable must a director's conduct be before he will be considered a 'wrongdoer' within the meaning of the adverse domination doctrine." 4 F.3d at 1309.

There are two theories on what constitutes domination. First, there is the complete domination theory. Under this theory, "a plaintiff who seeks to toll the statute ... must show 'full, complete and exclusive control in the directors or officers charged.' " *Id.* (quoting *Mosesian v. Peat, Marwick, Mitchell & Co.,* 727 F.2d 873, 879 (9th Cir.), *cert. denied,* 469 U.S. 932, 105 S.Ct. 329, 83 L.Ed.2d 265 (1984)). "Once the facts giving rise to possible liability are known, the plaintiff must effectively negate the possibility that an informed stockholder or director could have induced the corporation to sue." *Id.* at 1309–10. Second, there is the majority domination theory. Under this theory, a "plaintiff must show only that a majority of the board members were wrongdoers during [the] period the plaintiff seeks to toll the statute." *Id.* at 1310.

The *Farmer* and *Chapman* courts chose the complete domination theory, but we choose the other one, the majority domination theory. First, the majority theory is the majority rule. *Dawson,* 4 F.3d at 1310. Second, the majority rule makes sense. It is reasonable to presume that a culpable majority would act in its own interest. If it does, it is also reasonable to presume that the majority would conceal information and prevail on whether to pursue claims. "As a result, it [would] be extremely difficult, if not impossible, for the corporation to discover and pursue its rights." *Id.* Third, nothing in the Illinois discovery rule implies that the Illinois Supreme Court would chose other than the majority rule. Therefore, on this issue, we respectfully disagree with the *Farmer* and *Chapman* courts.

There are three theories on what constitutes culpability. First, there is the "intentional wrongdoing" theory, which theory places the culpability floor at intentional conduct. *FDIC v. Henderson,* 61 F.3d 421, 427 n. 3 (5th Cir.1995) (applying Texas law); *see FDIC v. Cocke,* 7 F.3d 396 (4th Cir.1993), *cert. denied,* —— U.S. ——, 115 S.Ct. 53, 130 L.Ed.2d 12 (1994) (applying Virginia law). Second, there is the "more than mere negligence" theory, which theory places the culpability floor somewhere between gross negligence and intentional conduct. *Chapman,* 895 F.Supp. at 1079 (applying Illinois law); *Farmer,* 865 F.Supp. at 1157 (applying Pennsylvania law); *RTC v. Blasdell,* 1994 WL 583131, at *14 (D.Ariz.1994) (applying Arizona law). Third, there is the "at least negligence" theory, which places the culpability floor at negligent conduct. *RTC v. Fleischer,* 890 F.Supp. 972, 976 n. 2 (D.Kan.1995) (applying Kansas law); *RTC v. Fiala,* 870 F.Supp. 962, 974 (E.D.Mo.1994) (applying Missouri law).

The "intentional wrongdoing" theory is viable. First, the adverse domination doctrine presumes that those who engage in culpable activity will make it difficult for others to discover their misconduct. Similarly, it presumes that, if others discover the misconduct, the culpable directors will make it difficult for the company to pursue its claims. Both presumptions imply that the culpable directors take an active, intentional role. *Blasdell,* 1994 WL 583131, at *14. Second, "[i]f [the] adverse domination [doctrine] is not to overthrow the statute of limitations completely in the corporate context, it must be limited to those cases in which the culpable directors have been active participants in wrongdoing or fraud." *Dawson,* 4 F.3d at 1312. Third, in the Illinois cases that come closest to endorsing the adverse domination doctrine, *Auer* and *Butts,* the culpable trustees were just such active participants. Therefore, perhaps we should adopt the "intentional wrongdoing" theory here.

On the other hand, the "at least negligence" theory is also viable. First, under this theory, courts again consider the adverse domination doctrine's presumptions, but they reach a different conclusion. "[B]ecause of a lack of information on the part of innocent actors, or unwillingness on the part of the culpable directors to sue themselves" the doctrine tolls the statute of limitations. *Fiala,* 870 F.Supp. at 974–5. "This rationale applies even if the board's conduct does not rise to the level of fraud or purposeful conduct." *Id.* at 975. Therefore, it is "consistent with the rationale of the adverse domination [doctrine] to apply [it] in cases involving breach of fiduciary duty, negligence, or gross negligence." *Id.* at 974. Second, we should be most concerned with the Illinois cases that apply the discovery rule because they are the basis for our derivation of the adverse domination doctrine. In *Hermitage,* the Illinois Supreme Court applied the discovery rule to negligence claims. 166 Ill.2d at 74 and 87, 209 Ill.Dec. 684, 651 N.E.2d 1132. Therefore, perhaps we should adopt the "at least negligence" theory here.

■ To resolve this issue, we step back and consider what the plaintiff has to prove if a defendant raises a statute of limitations defense. "When a plaintiff uses the discovery rule to delay commencement of the statute of limitations, the plaintiff has the burden of proving the date of discovery." *Hermitage,* 166 Ill.2d at 85, 209 Ill.Dec. 684, 651 N.E.2d 1132. In the corporate context, that means that the plaintiff must prove the date on which the company knew or should have known of its cause of action. In turn, that means that the plaintiff must prove the date on which the majority of the directors knew or should have known of the cause of action. For a plaintiff to prove that date, how culpable must the directors be? To take care of the "knew" part, their culpability level must include knowledge. But what about the "should have known" part? For that, their culpability level must be the point at which the plaintiff may impute knowledge to them. That point is recklessness. Below, we discuss how in Illinois recklessness is equivalent to gross negligence. So if the plaintiff can prove that the directors exhibited recklessness/gross negligence, the plaintiff can carry its burden and prevail against a statute of limitation defense. This result perhaps jibes best with the "more than mere negligence" theory, but it pinpoints the culpability floor at recklessness/gross negligence.

■ We consider whether the RTC adequately pleads that a majority of the Defendants exhibited recklessness/gross negligence until at least February 1, 1985. The RTC pleads that, until February 1, 1990, the Defendants "comprised a majority of Clyde's Board and [they] controlled and dominated the actions and decisions of Clyde." Compl. at 9. Moreover, it pleads that, while the Defendants comprised a majority, they acted "recklessly" and with "gross negligence." *Id.* at 10 and 17. For example, "in 1983 and thereafter," they failed to "heed regulatory criticisms as set forth in the [FHLBB] Examination reports, correspondence and supervisory meetings." *Id.* at 10. Particularly in the context of a motion to dismiss, that example sounds sufficiently in recklessness/gross negligence. *See Id.* at 13 and 15 (providing other examples sounding sufficiently in recklessness/gross negligence). Therefore, the RTC adequately pleads facts sufficient for us to apply the adverse domina-

tion doctrine and toll the accrual of its claim for gross negligence until after February 1, 1985.

Next, however, the Defendants argue that, if we apply the doctrine, we should limit the application because the FHLBB knew or reasonably should have known of their alleged wrongdoing as early as 1983. Defs'.Rep.Br. at 3. "[I]t is simply not sound policy to allow federal regulators to ignore problems as they happen, and then years later come back and impose substantial burdens on defendants to defend and the courts to decide events that happened in the distant past." *Id.* at 4. "Because the FHLBB knew or reasonably should have known ... long before the limitations date and also possessed the power to address that wrongdoing, any state law claims against [the Defendants] would not have been tolled during that time." *Id.* at 5. Consequently, the Defendants argue that those claims were "stale at the time the RTC was appointed receiver." *Id.* at 5.

The RTC responds that we should not limit the application of the adverse domination doctrine. "The FHLBB's knowledge of [the] [D]efendants' wrongdoing and possible ability to place Clyde into receivership ... is irrelevant to the [doctrine]." Pl.'s Br. at 10. "There are many complex issues that federal regulators consider in deciding whether or not to close a financial institution." *Id.* Under the Defendants' argument, "these complicated issues ... would all be reduced to a single question—the need to file a professional liability claim." *Id.* Moreover, "[u]nlike [the] Defendants, regulators were not charged with protecting Clyde's interests, and [the] Defendants should not avoid the consequences of their gross negligence on the basis of the regulators' knowledge thereof." *Id.* at 11. Consequently, the RTC argues that we should continue to toll the statute of limitations until at least February 1, 1985, which would make its claim not stale at the time it was appointed receiver.

In *Farmer*, the court considered whether a regulatory body may "qualif[y] as an informed, empowered, but not culpable person" such that it may negate adverse domination. 865 F.Supp. at 1158. The court wrote that:

[v]irtually every court that has addressed this issue, in whatever guise the defendants raised it, has held that the fact that a regulatory body—even the eventual plaintiff—acquired knowledge of the wrong and possessed certain power over the institution, including the ability to request director resignations, does not negate the [doctrine] or constitute, standing alone, the necessary cessation of domination....

*Id.* (citing *RTC v. Hecht*, 833 F.Supp. 529, 533 (D.Md.1993); *RTC v. Fleischer*, 826 F.Supp. 1273, 1277–8 (D.Kan.1993); *FDIC v. Howse*, 736 F.Supp. 1437, 1442 (S.D.Tex. 1990); *FDIC v. Buttram*, 590 F.Supp. 251, 254 (N.D.Ala.1984)). Subsequent courts that have considered the issue, however, suggest that the *Farmer* court's view may be overstated. *See RTC v. Barton*, 1995 WL 241849, at *4 (E.D.La. April 24, 1995); *RTC v. Wood*, 870 F.Supp. 797, 808–9 (W.D.Tenn.1994); *O'Bear*, 886 F.Supp. at 666–7.

*O'Bear* and *Barton* are distinguishable because the agencies assumed active or latent control of the financial institutions. In *O'Bear*, the limitations period began to run when, "[a]s a result of [a] ... Consent Agreement, the FHLBB assumed and acquired complete managerial and operational control of [the financial institution] and its Board of Directors." 886 F.Supp. at 666–7. In *Barton*, the limitations period began to run when, as a result of the OTS declaring the financial institution insolvent, the institution's "Board serv[ed] at the mercy of the OTS." 1995 WL 241849, at *4. At that point, the Board "was not adversely dominating anything but instead was required to ask permission before making any loans." *Id.* In this case, however, at least before February 1, 1985, the FHLBB did not impose a Consent Agreement or declare Clyde insolvent. Or more generally, it did not assume active or latent control of Clyde.

*Wood* is also distinguishable, and it is an outlier. In that case, the limitations period began to run when, as a result of the FHLBB's "aware[ness] of the [financial institution's] declining net worth position and resultant decreased life expectancy," the FHLBB could no longer "reasonably claim lack of knowledge" of its claim. 870 F.Supp.

at 808. At that point, the FHLBB "possessed the authority to appoint a conservator." *Id.* In effect, the court decided not to toll the accrual because the FHLBB had the authority to assume active or latent control, even if it did not exercise that authority. In this case, however, the FHLBB did not clearly have the authority to appoint a receiver before February 1, 1985. Further, in this case, there is no evidence that the FHLBB was "willful[ly] blind[ ]" to its authority such that it injured the Defendants' rights and implicated their policy concerns. *See Id.* at 809. In any event, the *Wood* court's decision, made without the benefit of briefing or citations to authority, is uncompelling precedent.

On the facts of this case, the *Farmer* court's result remains persuasive. Therefore, we apply the adverse domination doctrine and toll the accrual of the RTC's claim until at least February 1, 1985. And therefore, its claim is timely.

### 2. Stating a Cause of Action

■ The Defendants argue that the RTC may not sue for gross negligence. "Under FIRREA, the Court must turn to applicable state law to determine and define the appropriate standard for gross negligence." Def. Br. at 8. Illinois law, however, does not "recognize degrees of negligence" and does "not recognize a separate and independent tort of [gross negligence]." *Id.* "If the governing state law does not create a cause of action for gross negligence or similar conduct, then there is no 'applicable' state law to which the court can turn to define and determine those terms for the purposes of imposing liability." *Id.* at 8–9. Consequently, the Defendants argue that we should dismiss the RTC's claim.

The RTC responds that we should not dismiss it. It argues that federal law provides that it may sue for gross negligence; that federal law provides that state law should provide only the definition of gross negligence; and that Illinois law provides such a definition. Pl.'s Br. at 13. Consequently, the RTC argues that we should not dismiss its claim.

The applicable statute governing liability of directors and officers is 12 U.S.C. § 1821(k) ("§ 1821(k)"), and it provides:

A director or officer of an insured depository institution may be personally liable for monetary damages in a civil action ... for gross negligence, including similar conduct or conduct that demonstrates a greater disregard of a duty of care (than gross negligence) including intentional tortious conduct, as such terms are defined under applicable State law.

In *Gravee*, the court rejected the Defendants' argument. It wrote that "under *Chapman*, it is perfectly clear that § 1821(k) creates a federal cause of action for gross negligence." 1995 WL 75373, at *4; *see Chapman*, 29 F.3d at 1124. The *Gravee* court explained that there is a qualitative difference between providing the rule of decision and the definition of a term. *Id.* In this case, Section 1821(k) provides the rule of decision, and, because of unfortunate congressional drafting, Illinois law provides the definition of the term. Moreover, Illinois does not need to have a cause of action for gross negligence for it to define the concept of gross negligence. Therefore, we agree with the *Gravee* court's reasoning and result, and we deny the Defendant's motion to dismiss the RTC's claim on this ground.

■ Next, the Defendants argue that, even if the RTC may bring a gross negligence claim, it fails to allege facts sufficient to sustain the claim in this case. "In the place of gross negligence, Illinois courts employ the concept of 'willful and wanton misconduct.'" Def.'s Br. at 8. "[S]ince [the RTC's] allegations relate to breaches of fiduciary duty, the court should use the standard of willful and wanton misconduct that is employed by Illinois courts in the context of breaches of fiduciary duties." *Id.* at 11. "In that context, a plaintiff must plead and prove intentional breach of duty to establish willful and wanton misconduct." *Id.* Consequently, the Defendants argue that, because the RTC's "complaint contains not a single allegation of intentional wrongdoing," we should dismiss the RTC's claim. *Id.*

The RTC responds that it does not fail to allege sufficient facts. The RTC argues that

the definition of gross negligence is very great negligence, which is something less than willful and wanton conduct. Pl.'s Br. at 14. Moreover, "[t]o the extent that *Ziarko* [*v. Soo Line R.R.*, 161 Ill.2d 267, 204 Ill.Dec. 178, 641 N.E.2d 402 (1994),] was blurring the distinction between gross negligence and willful and wanton conduct, it is because the court was lessening the willful and wanton standard, not increasing the gross negligence standard." *Id.* at 15. "[E]ven if the Court concludes that the RTC must plead willful and wanton conduct, *Ziarko* confirms that willful and wanton conduct does not rise to the level of intentional conduct." *Id.* Consequently, the RTC argues that, because its complaint contains allegations of very great negligence, we should not dismiss its claim.

Illinois civil law provides no practical, affirmative definition of gross negligence. In *Chicago, Rock Is. & Pac. Ry. Co. v. Hamler*, 215 Ill. 525, 74 N.E. 705 (1905), the court discussed the issue of comparative negligence. It wrote that, "[f]ormerly, this court, in expounding the doctrine of comparative negligence, classified negligence into three degrees, as slight, ordinary and gross; but that doctrine was long ago abolished." *Id.* at 533, 74 N.E. 75. "One of the reasons given by the courts for disregarding supposed distinctions in degrees of negligence [was] the inability to give the terms 'slight,' 'ordinary' and 'gross' any definite meaning and the impracticability of applying any rule based on the supposed distinction." *Id.* at 536, 74 N.E. 75. Courts were unable to give the terms meaning because "[n]egligence cannot be divided into three compartments by mathematical lines." *Id.* at 535, 74 N.E. 75. Courts often speculated on meanings, but their "[s]peculations on that subject [led] to no practical result." *Id.* at 534, 74 N.E. 75.

Illinois civil law, however, provides a practical, negative definition of gross negligence. In other words, the law provides a sense of what gross negligence excludes. Most importantly, it excludes willful conduct, where such conduct is similar to intentional conduct. "Negligence and willfulness are as unmixable as oil and water." *Id.* at 540, 74 N.E. 75; *see Bartolucci v. Falleti*, 382 Ill. 168, 176, 46 N.E.2d 980 (1943) (same). In *Massa v. Dep't of Registration and Educ.*, 116 Ill.2d 376, 107 Ill.Dec. 661, 507 N.E.2d 814 (1987), the court affirmed the exclusion, writing that 'gross negligence is commonly understood to encompass 'very great negligence, ... [b]ut it is something less than ... willful, wanton and reckless conduct.' " *Id.* at 387, 107 Ill. Dec. 661, 507 N.E.2d 814 (quoting Black's Law Dictionary 932 (5th ed. 1979)). In *Burke v. 12 Rothchild's Liquor Mart, Inc.*, 148 Ill.2d 429, 170 Ill.Dec. 633, 593 N.E.2d 522 (1992), the court again affirmed the exclusion, writing that, "[i]n order to find [quasi-intentional willful and wanton] conduct[,] 'a state of mind different from that needed in ordinary and gross negligence is required.' " *Id.* at 449, 170 Ill.Dec. 633, 593 N.E.2d 522 (quoting *Morrow v. L.A. Goldschmidt Assocs., Inc.*, 126 Ill.App.3d 1089, 1095, 82 Ill. Dec. 152, 468 N.E.2d 414 (1st Dist.1984), *judgment rev'd on other grounds*, 112 Ill.2d 87, 96 Ill.Dec. 939, 492 N.E.2d 181 (1986)). And in *Ziarko*, the court yet again affirmed the exclusion, approving of the *Burke* court's "perception of a 'qualitative difference' between negligent [conduct] and willful and wanton conduct ... that amounts to intentional behavior." 161 Ill.2d at 273 and 279, 204 Ill.Dec. 178, 641 N.E.2d 402.

Meanwhile, § 1821(k) excludes culpability for simple negligence. The statute's plain language requires more; it requires gross negligence "or conduct that demonstrates a greater disregard of a duty of care than gross negligence." *Id.* Moreover, the Seventh Circuit interprets the statute as requiring more. *Gallagher*, 10 F.3d at 418 (finding that FIRREA "pre-empts federal common law and establishes a gross negligence standard of liability for officers and directors of failed federally chartered institutions"); *Gravee*, 1995 WL 75373, at *3 (writing that "[a]fter *Gallagher*, *O'Melveny*, and *Chapman*, the RTC cannot proceed against the directors and officers of such an institution on a claim of simple negligence, whether under state law or federal common law").

So we return to Illinois law with the parameters that the term gross negligence must mean something less than intent and something more than negligence, and, on our return, we discover that Illinois criminal law

defines gross negligence as recklessness. In *Illinois v. Khan,* 136 Ill.App.3d 754, 91 Ill. Dec. 544, 483 N.E.2d 1030 (1st Dist.1985), the court wrote that "[t]he terms 'gross carelessness' and 'gross neglect' or 'gross negligence' are the historical predecessors of the term 'recklessness' and have the same meanings." *Id.* at 760, 91 Ill.Dec. 544, 483 N.E.2d 1030; *see Illinois v. Howard,* 232 Ill.App.3d 386, 392, 173 Ill.Dec. 729, 597 N.E.2d 703 (1st Dist.), *appeal denied,* 146 Ill.2d 639, 176 Ill. Dec. 810, 602 N.E.2d 464 (1992) (same). The term recklessness denotes " 'a course of action which ... shows an utter indifference to or a conscious disregard for a person's own safety and the safety of others.' " *Ziarko,* 161 Ill.2d at 279, 204 Ill.Dec. 178, 641 N.E.2d 402 (quoting IPI Civil 3d No. 14.01).

Defining gross negligence as recklessness is consistent with horn book law. In William Prosser, *The Law of Torts* § 34 (4th ed. 1971), the professor writes:

> The result is that "wilful," "wanton" or "reckless" conduct tends to take on the aspect of highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of danger is apparent. As a result there is often no clear distinction at all between such conduct and "gross" negligence, and the two have tended to merge and take on the same meaning, of an aggravated form of negligence, differing in quality rather than in degree from ordinary lack of care.

*Id.* at 185.

More importantly, though, defining gross negligence as recklessness is consistent with Illinois law. The consistency is evident from *Ziarko.* In that case, the court wrote that "[o]ur case law has sometimes used interchangeably the terms ... 'gross negligence[ ]' and 'willful and wanton conduct.' " 161 Ill.2d at 274–5, 204 Ill.Dec. 178, 641 N.E.2d 402. The court explained that willful and wanton conduct has two aspects, a recklessness aspect and an intentional aspect. If gross negligence is similar to recklessness, and willfulness and wantonness has an aspect of recklessness, we would expect Illinois courts to sometimes use gross negligence and willfulness and wantonness interchangeably. They would because the intersection of gross

negligence and willfulness and wantonness would be the subset of recklessness. *See RTC v. Fortunato,* 1994 WL 478616, at *4 (N.D.Ill. Sept. 1, 1994). The Defendants' argument goes astray when it posits that the intersection would also include the subset of intent. From *Hamler* to *Ziarko,* we know that cannot be correct.

There is, however, one exception to the proposition that defining gross negligence as recklessness is consistent with the Illinois law. As we wrote above, the *Massa* court defined gross negligence as "very great negligence, ... but something less than ... reckless conduct." 116 Ill.2d at 387, 107 Ill.Dec. 661, 507 N.E.2d 814. We discount the *Massa* court's definition for four reasons. First, it defines gross negligence as very great negligence, and that is unhelpful. What is very great negligence? Recalling the *Hamler* court's warning that "[s]peculations on that subject lead to no practical result," we do not attempt to determine what it is. 215 Ill. at 534, 74 N.E. 705. Second, the *Massa* court's definition quotes Black's Law Dictionary out of context. After the quote, the Dictionary provides: "It falls short of being such reckless disregard of probable consequences as is equivalent to a wilful and intentional wrong." 932 (5th ed. 1979). Given the Dictionary's restricted view of "reckless conduct," making it equivalent here to intentional conduct, the *Massa* court's definition is unremarkable. Third, in the over eight years since the court handed down *Massa,* no other court has cited its definition of gross negligence, and this despite the subsequent watershed opinions in the area of comparable culpability. *E.g., Ziarko,* 161 Ill.2d at 267, 204 Ill.Dec. 178, 641 N.E.2d 402; *Burke,* 148 Ill.2d at 429, 170 Ill.Dec. 633, 593 N.E.2d 522. Its definition appears to be a dead letter. Fourth, the *Massa* court defines gross negligence at the low end of that term's possible culpability range, but due process leads us to define it at the high end. Therefore, we discount the *Massa* court's definition and define gross negligence as recklessness.

 We consider whether the RTC alleges facts sufficient to sustain a claim for gross negligence, defined as recklessness. As we

discussed above, the RTC alleges that, among other things, the Defendants failed to "heed regulatory criticisms as set forth in [FHLBB] Examination reports, correspondence and supervisory meetings." Compl. at 10. Again particularly in the context of this motion to dismiss, the RTC's allegations sound sufficiently in gross negligence. *See Id.* at 13 and 15 (providing other examples sounding sufficiently in gross negligence). Therefore, the RTC alleges facts sufficient to sustain a claim for gross negligence.

### 3. *Considering the Business Judgment Rule*

■ The Defendants argue that the RTC's allegations fall within the protection of the business judgment rule. They argue that the RTC's allegations that they acted improperly and inappropriately by, for example, failing to develop procedures and supervise programs "merely attack [their] [protected] business judgments." Defs'.Br. at 13. They further argue that the RTC's allegations "that suggest that [they] based certain decisions on inadequate information and those that suggest that [they] improperly delegated certain functions to committees and directors" "come closest to rebutting the presumption of the business judgment rule." *Id.* at 14. Yet even those allegation attack protected judgments. *Id.* Consequently, the Defendants argue that we should dismiss the RTC's claim.

The RTC responds that its allegations do not fall within the protection of the rule. First, it argues that the business judgment rule is inapplicable because § 1821(k) does not incorporate elements of state law outside of the definition of gross negligence. Second, it argues that the rule is inapplicable because "the effect of a business judgment rule is to raise a director's standard of care from simple to gross negligence. Thus, § 1821(k)'s gross negligence standard already implicitly incorporate a business judgement rule." Pl.'s Br. at 16. Third, if the rule applies, the RTC's allegations, which challenge the Defendants' skill and diligence, are sufficient. Consequently, the RTC argues that we should not dismiss its claim.

In this circuit, two courts have considered the Defendants' argument, and both have rejected it. First, in *Gallagher,* the court wrote that "the [RTC's] claims all sound in federal law rather than in state law. Therefore, Illinois' business judgment rule has no application." 800 F.Supp. at 602–3. The court explained that "[t]he previously existing federal common law ... has been replaced by § 1821(k), which set the federal liability standard of gross negligence." *Id.* at 603; *see Chapman,* 29 F.3d at 1123 (writing that § 1821(k) "adopts gross negligence as the rule for managers and directors of federal financial institutions"). And second, in *O'Bear,* the court "elect[ed] not to consider cases under the Indiana business judgment rule." 886 F.Supp. at 668 n. 8. We agree with those courts, their reasoning and result, and, therefore, we also reject the Defendants' argument.

### 4. *Pleading the Causation Requirement*

The Defendants argue that the RTC inadequately alleges causation. "It is evident from the complaint that the RTC has failed to allege that the ... losses supposedly suffered by Clyde were actually caused, in fact, by defendants' alleged misconduct." Defs'.Br. at 16. Specifically, "the RTC alleges transaction causation but not loss causation with respect to the trading and lending losses." *Id.* at 17. "[R]ead most generously, the RTC's complaint alleges merely that the defendants' inexperience ... caused Clyde to become—or remain—involved in three business matters which subsequently happened to produce losses for the institution, not that the defendants' inexperience ... actually caused the losses." *Id.* Moreover, "the RTC does not ever allege that any of losses were proximately caused by any grossly negligent conduct." *Id.* Consequently, the Defendants argue that we should dismiss the RTC's Complaint.

The RTC responds that it adequately pleads causation. It argues that the Complaint "plainly alleges that Clyde suffered losses 'as a direct and proximate result of' [the] Defendants' gross negligence." Pl.'s Br. at 18 (quoting Compl. at 17). The RTC further argues that the Complaint "satisfies

the [loss causation] standard." *Id.* at 19. "For example, consistent with the allegations of the Complaint, the RTC can prove that [the] Defendants knew so little about options trading that [they] traded inconsistently with their own interest rate prediction" and, as a result, lost money. *Id.* at 19. Consequently, the RTC argues that we should not dismiss its Complaint.

In *Bastian v. Petren Resources Corp.*, 892 F.2d 680 (7th Cir.), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2590, 110 L.Ed.2d 270 (1990), the court discussed the law governing loss causation. The court wrote that " '[l]oss causation' [expresses] ... the standard rule of tort law that the plaintiff must allege and prove that, but for the defendant's wrongdoing, the plaintiff would not have incurred the harm of which he complains." *Id.* at 685 (citation omitted); *see Roots Partnership v. Lands' End, Inc.*, 965 F.2d 1411, 1419 (7th Cir.1992). "Some cases describe the requirement of showing loss causation in Rule 10b–5 as an element of proximate cause, (*see* Defs'.Br. at 16), but we think it [is] more accurately described as an element of ['but for'] caus[ation], period." *Id.* at 686. Although the term loss causation appears in securities fraud cases, it disappears § 1821(k) cases. In this case, we look behind the term and inquire whether the plaintiff sufficiently pleads 'but for' causation.

In *FDIC v. Bierman*, 2 F.3d 1424, the Seventh Circuit discussed the law governing proximate causation. The court wrote that "[i]t is well settled that a director will not be liable for losses to the corporation absent a showing that his act or omission proximately caused the subsequent losses." *Id.* at 1434. "[P]roximate cause is 'that cause which, in natural and continuous sequence, unbroken by any efficient intervening cause, produces the result complained of and without which the result would not have occurred.' " *Id.* (quoting *FDIC v. Stanley*, 770 F.Supp. 1281, 1310 (N.D.Ind.1991), *judgment aff'd*, 2 F.3d 1424 (7th Cir.1993)). "Nor must an action be the sole cause to be the proximate cause; it need only be a substantial factor in producing the injury if the injury were reasonably foreseeable at the time of the wrongful act." *Id.*

We consider whether the RTC sufficiently alleges causation for its gross negligence claim. Among other things, the RTC alleges that the Defendants failed to heed the FHLBB's criticisms of its options activities. It alleges that they relied on information from an interested broker in its Aransas Loan. It alleges that they relied on a false assumption about private insurers in its Landbank Loan. And it alleges that "[a]s a direct and proximate result of [their] gross negligence, Clyde suffered substantial damage and loss." Compl. at 17. We recall that, for the purposes of this motion, we consider the RTC's allegations in the light most favorable to the RTC. In that light, the Directors' failings and reliances could be the 'but for' cause of Clyde's losses. Moreover, the Defendants "reasonably could have foreseen" that their failings and reliances could be "a substantial factor leading to" Clyde's losses. *Bierman*, 2 F.3d at 1434. Therefore, the RTC sufficiently alleges causation.

*IV. Conclusion*

For the reasons discussed above, we grant, with prejudice, the Defendants' motion to dismiss the RTC's Counts I, III and IV, and we deny their motion to dismiss its Count II.